### A. G. WINEMAN & SONS v. REEVES et al.

(Circuit Court of Appeals. Fifth Circuit. October 4, 1917.)

No. 2904.

1. ACTION ☞37—ERROR AS TO FORM—TRANSFER.

Under equity rule 22 (198 Fed. xxiv, 115 C. C. A. xxiv), providing that, if it shall appear that a suit commenced in equity should have been brought on the law side of the court, it shall be forthwith transferred to the law side, if the right asserted by plaintiffs was the legal title to land shown to be in defendant's possession, and what they sought was the possession and enjoyment of such land, this would not have justified the dismissal of a bill in equity, but the suit should have been ordered transferred to the law side of the court.

2. COURTS ☞262(3)—FEDERAL COURTS—EQUITY JURISDICTION—INADEQUACY OF LEGAL REMEDY.

Where plaintiffs had legal title to uninclosed timber river bottom land and the right to its possession, and had such possession thereof as the character of the land made reasonably practicable, and defendants were not in possession thereof, but, under unfounded claims of ownership, had trespassed upon and got timber from it, and, unless enjoined, would continue to do so, the remedy at law was inadequate, so as to authorize the maintenance of a bill in equity to declare defendant's claims of title void and confirm plaintiffs' title.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. COURTS ⬤262(3)—FEDERAL COURTS—EQUITY JURISDICTION—INADEQUACY OF LEGAL REMEDY.

Under Code Miss. 1906, §§ 549-552, permitting a bill to be maintained to confirm plaintiffs' title to land claimed by defendant, whether plaintiffs are in possession or not, such enlargement of equitable right may be enforced in a federal court of equity, unless plaintiffs have an adequate and equally efficient remedy at law.

4. STATES ⬤12(2)—BOUNDARIES—STREAMS.

The rule that a riparian proprietor of land bounded by a stream, the banks of which are changed by the gradual and imperceptible process of accretion or erosion, continues to hold to the stream as his boundary, but that, where the stream suddenly and perceptibly abandons its old channel, the boundary remains at the former line, is equally applicable to the boundary between two states.

5. STATES ⬤12(2)—BOUNDARIES—STREAMS.

Where the Mississippi river's change of its main channel from the route around a bend to a route through a chute intersecting the peninsula formed by the bend was due to a distinctly manifested diversion of a larger volume of water through the chute, and its action was visible and violent, and accompanied by the rapid caving of the banks of the chute and the carrying away of adjacent soil, with the timber on it, and cattle were carried off by the torrent, with the land on which they happened to be, there was such a change in the channel of the river as had no effect upon the boundary between the states of Mississippi and Arkansas.

6. NAVIGABLE WATERS ⬤44(3)—STATES ⬤12(2)—BOUNDARIES—ACCRETIONS.

Where the Mississippi river suddenly abandoned its old channel and formed a new channel, so that a considerable body of land formerly on one side of the river was thereafter on the other, the center line of the old channel, which before was a boundary subject to change of location by accretion and erosion, became a fixed and unvarying boundary, unaffected by changes afterwards occurring in either the new channel or in the old bed of the river, though under water, and gradual and imperceptible accretions to the Arkansas shore line of the old channel did not enlarge the state of Arkansas, or diminish the area of the state of Mississippi, or add to or lessen what was included within the boundary lines of the subdivisions of land in the two states which were contiguous and had the old channel as a common boundary.

Appeal from the District Court of the United States for the Northern District of Mississippi; Henry C. Niles, Judge.

Suit by A. G. Wineman & Sons against W. D. Reeves and others. From a decree dismissing the bill, plaintiffs appeal. Reversed and remanded.

Gerald Fitz Gerald, of Clarksdale, Miss. (George F. Maynard, of Clarksdale, Miss., and Hugh C. Watson, of Greenville, Miss., on the brief), for appellant.

D. A. Scott, of Clarksdale, Miss., F. A. Montgomery, of Tunica, Miss., and J. B. Daggett, of Marianna, Ark., for appellees.

Before PARDEE and WALKER, Circuit Judges, and FOSTER, District Judge.

WALKER, Circuit Judge. The appellants, A. G. Wineman & Sons, brought two suits, one of them in the chancery court of Tunica county, Miss., against W. D. Reeves, J. D. Asher, John P. Moore, and A. C. Sexton, the bill in which averred that the complainants are the true and lawful owners of described lands, including accretions thereto, al-

⬤For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

leged to be in said Tunica county, that the defendants falsely claim to own part of said lands and timber growing on parts thereof, and under said claims have been entering upon said lands and cutting and removing timber therefrom, and, unless restrained, will continue so to do; and the bill prayed that the claims of title asserted by the defendants be declared void and held for naught, and that the title of the complainants to said land, including accretions and standing timber, be in all things confirmed. The other suit was one in replevin, brought against the appellee J. D. Asher in the circuit court of the same county for the recovery of logs cut from land described in the bill in the first-mentioned suit. Each of the suits was removed to the United States District Court for the Northern District of Mississippi. In that court, by agreement of the parties, the two suits were consolidated and tried as one; the agreement providing that the decision in the consolidated suit should be binding and conclusive on all the parties to both suits. The result of such trial was a decree dismissing the appellants' bill of complaint; that decree reciting that, the court "being satisfied that none of the lands in controversy, as described in the pleadings, are now, or were at the commencement of this suit, located and situated in the state of Mississippi; that said lands were formed by changes in the channel of the Mississippi river, caused by gradual erosion of the Mississippi shore, and were not formed by avulsion, and are accretions to the original lands on the Arkansas shore, and all of said lands are located and situated in the state of Arkansas; and that the plaintiffs are not owners of the land in controversy, and are not entitled to the relief prayed for, or to any other relief whatsoever." The appeal is from this decree.

The main channel of the Mississippi river as it was in 1824, when the Arkansas shore opposite Tunica county, Miss., was surveyed and platted, and in 1836, when the Mississippi shore, including that of Tunica county, was surveyed and platted, and as it remained for many years afterwards, except for slight changes, due to accretions to one shore and erosions from the other, went, in the direction of the flow of the water, around a bend, called Walnut Bend, turning from the westerly direction it had before the bend was reached to a northwesterly direction, and then turning again and going in a southerly direction. The result was that the land within the bend was a peninsula, extending from the Mississippi mainland in a northerly direction, except that there were two chutes, the northerly one called Whisky Chute, and the one farther south called Bordeaux Chute, through which there was, except when the river was quite low, some flow of water from the part of the river in the upper reach of the bend to the part in the lower reach of the bend. The island made by what was cut off by the first-mentioned chute was called Whisky Island, and another island, which was larger and farther south, and was bounded on the northwest by Whisky Chute and on the southwest by Bordeaux Chute, was called Bordeaux Island. Many years ago, about 1869, or a little, though not much, later, but exactly when was not satisfactorily proved by the evidence, the main channel of the river ceased to be around Walnut Bend. When this change first occurred, the new route of the main channel was through Bordeaux Chute. A result of the greater volume of the wa-

ter of the river forcing its way through that chute was that the river overflowed the part of the peninsula which was east of that chute and washed away much of its surface. This process continued for several years, while the main channel was working its way farther south. Many years before the two suits mentioned were brought in 1914 the main channel of the river had shifted so far to the south that not only all of Whisky Island and the greater part of Bordeaux Island, but also five fractional sections of land which formerly constituted a part of the mainland of Tunica county, were north of the northern shore of the river; whereas, formerly both of the islands and all the land within the boundaries of the subdivisions mentioned were on the other side of the river. What the plaintiffs claim to be the owners of is a large part of this land, with the accretions thereto, which is now north of the river, much of which was covered by the river before it reached its present channel. It gradually emerged again as the channel shifted farther south; new deposits being made where the force of the current in the main channel had scoured off the surface. It was admitted that the plaintiffs have a chain of deeds straight from the United States to all of this land as originally surveyed by the United States government in the year 1836, or thereabouts, and shown by the maps and plats of said survey to have been included in the state of Mississippi.

From the averments of the bill it is to be inferred that the plaintiffs understood that the contested claims set up by the defendants included only land which had emerged between the shore line of the subdivisions owned by the plaintiffs as it existed before the channel of the river deserted Walnut Bend and went through Bordeaux Chute, and where the middle of the old channel was before that change occurred, and a long-time right to cut timber on the remainder of such new land. The answers of the defendants so delineated the boundaries of the land claimed by them as accretions to subdivisions of land in Arkansas which they owned as to make their claims cover, not only land which had emerged in the space covered by the water of the river when it went around Walnut Bend, but also land south of the old Mississippi shore line of the subdivisions patented to the plaintiffs' predecessors in title, which had been submerged by the river and emerged again as the channel shifted farther to the south.

[1, 2] It was urged in the argument made in behalf of the defendants that the action of the court in dismissing the bill is sustainable on the ground that it was not made to appear that the remedy at law available to the plaintiffs was inadequate. The terms of the decree make it apparent that the dismissal of the bill was due, not to a conclusion that the plaintiffs had failed to show that their remedy at law was inadequate, but to the conclusion that the land which was the subject of controversy in the suit was beyond the territorial jurisdiction of the court. Even if it was true, as contended by counsel for defendants, that the right which the plaintiffs asserted was the legal title to land shown to be in the possession of the defendants, and that what they sought was the possession and enjoyment of that land, this would not have justified the dismissal of the bill; as, if such was the nature of the suit, the

proper decree to be rendered, pursuant to equity rule 22 (198 Fed. xxiv, 115 C. C. A. xxiv), was, not one dismissing the bill, but one ordering the transfer of the suit to the law side of the court, to be there proceeded with pursuant to the requirement of that rule. Corsicana National Bank v. Johnson, 218 Fed. 822, 134 C. C. A. 510. But the situation disclosed by the record indicates that the legal remedies available to the plaintiffs were inadequate. While the bill does not explicitly aver that the plaintiffs were, at the time the suits were brought, in actual possession of the land they claimed, it does show that they had the legal title to it, and had the right to possess and enjoy it. And there was evidence to support a finding that the plaintiffs had such possession of the land they claimed, which was uninclosed timbered river bottom land, as the character of the land made reasonably practicable. The bill averred and the evidence showed, not that the defendants were in possession of any of the land claimed by the plaintiffs, but that, under unfounded claims of ownership, they had trespassed upon and cut timber from it, and, unless enjoined, would continue to do so.

[3] In the opinion in the case of Holland v. Challen, 110 U. S. 15, 3 Sup. Ct. 495, 28 L. Ed. 52, in which it was held that a right given by a Nebraska statute to an owner of real property, whether in or out of possession, to maintain a suit against one claiming an adverse interest or estate in it, for the purpose of determining such estate and quieting the title, was enforceable in the United States court in favor of such an owner who was not in possession, it was said:

"No adequate relief to the owners of real property against the adverse claims of parties not in possession can be given by a court of law. If the holders of such claims do not seek to enforce them, the party in possession, or entitled to the possession—the actual owner of the fee—is helpless in the matter, unless he can resort to a court of equity."

Such an enlargement of equitable right resulting from a state statute may be enforced in a federal court of equity in favor of an owner of land not in possession, when the situation is such that the legal remedies available to such owner are inadequate or less efficient than the one he seeks by bill in equity. Devine v. Los Angeles, 202 U. S. 313, 26 Sup. Ct. 652, 50 L. Ed. 1046; Dick v. Foraker, 155 U. S. 404, 15 Sup. Ct. 124, 39 L. Ed. 201; Gormley v. Clark, 134 U. S. 338, 10 Sup. Ct. 554, 33 L. Ed. 909; New Jersey & N. C. L. & L. Co. v. Gardner-Lacy Lumber Co., 178 Fed. 772, 102 C. C. A. 220. Under Mississippi statutes the bill filed by the plaintiffs was maintainable in the state court in which it was brought, whether the plaintiffs were or were not in possession of the land they claimed. Code Miss. 1906, §§ 549–552. Upon its removal to the federal court, it was maintainable on the equity side of that court, unless, under the circumstances existing at the time the suit was brought, the plaintiffs had an adequate and equally efficient remedy at law. As the situation, as disclosed by the record, was such as to justify the conclusion that the legal remedies available to the plaintiffs were inadequate, we are not of opinion that it has been made to appear that the suit is one calling for an order transferring it to the law side of the court.

"It is the established rule that a riparian proprietor of land bounded by a stream, the banks of which are changed by the gradual and imperceptible pro-

cess of accretion or erosion, continues to hold to the stream as his boundary; if his land is increased, he is not accountable for the gain, and if it is diminished, he has no recourse for the loss. But where a stream suddenly and perceptibly abandons its old channel, the title is not affected, and the boundary remains at the former line." Philadelphia Co. v. Stimson, 223 U. S. 605, 624, 32 Sup. Ct. 340, 346, 56 L. Ed. 570.

[4-6] The rules stated are equally applicable, whether the question of boundary is one between private proprietors or between two states, the common boundary of which is a river. If the center of the channel is the boundary, however much its location may vary as the result of gradual and imperceptible accretion and erosion, it remains the boundary. But if the change is violent and visible, and arises from a known cause, other than gradual and imperceptible accretion and erosion, such as a cut through which a new channel is formed, the thread of the stream as it existed when such change occurred continues to be the boundary. State of Nebraska v. State of Iowa, 143 U. S. 359, 12 Sup. Ct. 396, 36 L. Ed. 186. In the case last cited it was decided that a change of the boundary between the states of Nebraska and Iowa did not result from an abrupt, visible change of the course of the Missouri river at a place where the river, having previously "pursued a course in the nature of an ox-bow, suddenly cut through the neck of the bow and made for itself a new channel." We think that it is made to appear by the evidence in the pending case that the disclosed change of the course of the Mississippi river, which resulted from its forcing for itself a new channel in another direction, was made in a manner quite similar to that of the change of the course of the Missouri river which was under consideration in the case just cited, and, as in that case, was without effect upon the boundary as it existed before the change occurred. While much of the evidence in the case is not clear and satisfactory, due largely to witnesses in their testimony making reference to objects the location of which is not disclosed by the record on appeal, we think that it sufficiently shows by a decided preponderance of it that the change of the river's main channel from the route around Walnut Bend to the route through Bordeaux Chute was due to a distinctly manifested diversion of a larger volume of water through that chute. In forcing for itself a new channel in a different direction, the action of the river was visible and violent. Rapid caving of the banks of what before was only a chute or bayou, and the carrying away by the stream of adjacent soil, with the timber on it, marked the deepening and widening of the new passageway. Cattle were carried off by the torrent, with the land upon which they happened to be. There was apparently credible testimony to support the conclusion that the change of the location of the main channel was so quickly effected that boats which kept in the channel in making regular runs up and down the river went around Walnut Bend going one way and followed the Bordeaux Chute route on the return trip. It was a case of the river so cutting out a new channel for itself that, after the change was effected, there was a considerable body of land on the side of the river other than the one it was on before. A result of such an adoption by the river of a new channel was that the center line of the old channel, which before was a boundary subject to

change of location, became a fixed and unvarying boundary, unaffected by changes afterwards occurring in either the new channel or in the old bed of the river around Walnut Bend. The circumstance that, after the change of channel was effected, that old bed was still under water, did not prevent or delay the transformation of the former middle line of the channel around the bend from a shifting to a fixed boundary. That boundary was no longer subject to be affected by changes in the old river bed, or in its shore lines as they formerly existed.

It is to be inferred from the evidence that the emergence of land where the bed of the river formerly was around Walnut Bend occurred a considerable time after the river had made for itself a new main channel through Bordeaux Chute. Such filling up of that old river bed as occurred was by a gradual process; towheads, sandbars, and islands making their appearance above the surface of the water and gradually enlarging, while one or the other of the formerly existing shore lines encroached as the water receded from it, until space formerly occupied by the river was no longer under water. Whether it was or was not a fact that this new land so formed first made its appearance as additions to land on the Arkansas side of the boundary, the fact that the boundary had ceased to be a shifting one before the new land was added to the old prevented the change from having the effect of enlarging the state of Arkansas or of diminishing the area of the state of Mississippi, or of adding to or lessening what was included within the boundary lines of the subdivisions of land in the two states which were contiguous and had as a common boundary a line which formerly, but no longer, was a shifting one. Though it was by means of gradual and imperceptible accretions that new land was formed or built up from where the Arkansas shore line formerly was, until it extended beyond the boundary line of the two states, such a change in the surface conditions, in so far as it occurred after the boundary ceased to be a shifting one, was without effect on the title or ownership of the tracts the common boundary of which was fixed.

The claims asserted by the plaintiffs included no land on the Arkansas side of the center line of the old channel around Walnut Bend, as that line was located when the river made for itself a new channel through Misissippi land, part of which was patented by the United States to the plaintiffs' predecessors in title. Our conclusion is that the court was in error in declining to pass on questions duly raised by the pleadings and evidence in the case, on the ground that the land in dispute is not a part of the state of Mississippi.

Because of that error, the decree is reversed, and the cause is remanded for further proceedings not inconsistent with this opinion.