THE STATE EX INF. A. MOODY MANSUR, Prosecuting Attorney of Ray County, Appellant, v. VERNON HOFFMAN ET AL.—2 S. W. (2d) 582.

Court en Banc, February 4, 1928.

992

A. *Moody Mansur, Milligan & Thompson* and *John I. Williamson* for appellants.

*Lavelock & Kirkpatrick, Clark & Garner, Geo. W. Crowley* and *J. C. Jacobs* for respondent.

RAGLAND, J.—In this proceeding, which was instituted in the Circuit Court of Ray County, the State seeks to oust respondents as directors of Consolidated School District No. 4, in Ray and Lafayette counties, on the ground that said district was never legally organized or created. The circuit court denied ouster and the State appealed.

The facts are comparatively simple and they are not in dispute. The Consolidated District, which was formed on April 25, 1924, purported to embrace all the territory included within Camden Special School District, School District No. 85 and School District No. 87, all in Ray County, and School District No. 13 in Lafayette County. Prior to 1915 School District No. 13 was bounded on its west, north and east sides by the Missouri River. The form taken by the river where it made these boundaries was very much like that of an inverted letter U. In 1915, the river, suddenly and in one night, left its old channel and formed a new one along the southern boundary of the district, through which its waters have continuously flowed ever since. In 1915, and prior to the avulsion, the main channel of the river, where the river formed the three boundaries of District No. 13, was not where it was in 1875. During the period from 1875 to 1915 the channel had shifted, gradually and imperceptibly, far to the north and east. In 1922 the county courts of Ray and Lafayette counties, pursuant to the provisions of Sections 9408-9411, Revised Statutes 1919, ordered their respective county surveyors to proceed together and ascertain, survey and mark out the boundary between the two counties, which had been obliterated by the avulsion of the river in 1915. The line which these surveyors sought, surveyed, marked out and platted was that of the middle of the main channel of the river as it existed just prior to the river changing its course and as disclosed by the old abandoned river bed. A return of their proceedings was made and approved by the respective county courts and duly recorded.

In the notices and plats posted and filed in connection with the organization of the Consolidated School District the descriptions of the boundaries were based upon the hypothesis that the line marked out

by the surveyors of the two counties in 1922 was the dividing line between the counties. If that hypothesis was correct the boundaries were properly described and within them all of the territory of the three school districts heretofore mentioned was embraced. If on the other hand the boundary between the two counties was where it was in 1875, the descriptions of the boundaries of the Consolidated School District contained in the notices and plats were not only erroneous, but some of them impossible. And however construed they left out of the consolidated District a small segment of District No. 13.

The sole question in the case is whether at the time of the formation of the Consolidated District the boundary between the two counties was the line marked out by the surveyors in 1922, or whether it was where the center of the main channel of the Missouri River was in 1875.

The statute in force at the time of the adoption of the Constitution of 1875) now Secs. 9328 and 9368, R. S. 1919) made "the middle of the main channel of the Missouri River" the boundary between Ray and Lafayette counties. As affecting county boundaries the Constitution (Article IX) contains these provisions:

"Sec. 1. The several counties of this State, as they now exist, are hereby recognized as legal subdivisions of the State.

"Sec. 3. . . . No county shall be divided or have any portion stricken therefrom without submitting the question to a vote of the people of the county, nor unless a majority of all the qualified voters of the county or counties thus affected, voting on the question, shall vote therefor. . . .

"Sec. 4. No part of the territory of any county shall be stricken off and added to an adjoining county without submitting the question to the qualified voters of the counties immediately interested, nor unless a majority of all the qualified voters of the county thus affected, voting on the question, shall vote therefor."

Because of the constitutional and statutory provisions just mentioned the State in all of its contentions in this case has assumed that the boundary between the two counties has never varied a hair's breadth from where the middle of the channel of the river was in 1875, notwithstanding the channel had prior to 1915 gradually and imperceptibly shifted from that place far to the east and north. Under all the authorities the assumption is clearly wrong. For there is nothing in the language of either the statute or the Constitution to indicate that the framers in the one case or the Legislature in the other intended to alter or abolish the rules of the common law relating to running water as a boundary. In dealing with questions touching such a boundary, the Supreme Court of the United States has uniformly applied those rules (which are the same as those of the civil law and the law of nations), whether the boundary was one fixed by

treaty or by Act of Congress. [Missouri v. Kentucky, 11 Wall. 395; Nebraska v. Iowa, 143 U. S. 359; Missouri v. Nebraska, 196 U. S. 23; Washington v. Oregon, 211 U. S. 127.]

For a statement of the rules referred to in the preceding paragraph we cannot do better than quote from the opinion of Mr. Justice BREWER in Nebraska v. Iowa, supra, at page 360:

"It is settled law, that when grants of land border on running water, and the banks are changed by that gradual process known as accretion, the riparian owner's boundary line still remains the stream, although, during the years, by this accretion, the actual area of his possessions may vary. In New Orleans v. United States, 10 Pet. 662, 717, this court said: 'The question is well settled at common law, that the person whose land is bounded by a stream of water which changes its course gradually by alluvial formations, shall still hold by the same boundary, including accumulated soil. No other rule can be applied on just principles. Every proprietor whose land is thus bounded is subject to loss by the same means which may add to his territory; and, as he is without remedy for his loss in this way, he cannot be held accountable for his gain.' [Citing cases.]

"It is equally well settled, that where a stream, which is a boundary, from any cause suddenly abandons its old and seeks a new bed, such change of channel works no change of boundary; and that the boundary remains as it was, in the centre of the old channel, although no water may be flowing therein. This sudden and rapid change of channel is termed, in the law, avulsion. In Gould on Waters, sec. 159, it is said: 'But if the change is violent and visible, and arises from a known cause, such as a freshet, or a cut through which a new channel is formed, the original thread of the stream continues to mark the limits of the two estates.' [Citing cases.]

"These propositions, which are universally recognized as correct where the boundaries of private property touch on streams are in like manner recognized where the boundaries between states or nations are, by prescription or treaty, found in running water. Accretion, no matter to which side it adds ground, leaves the boundary still the centre of the channel. Avulsion has no effect on boundary, but leaves it in the centre of the old channel."

After quoting in part an opinion of Attorney-General Cushing in which were reviewed the authorities not only of the common law but of the civil law and the law of nations as well, the opinion proceeds:

"The result of these authorities puts it beyond doubt that accretion on an ordinary river would leave the boundary between two states the varying centre of the channel, and that avulsion would establish a fixed boundary, to-wit: the centre of the abandoned channel. It is contended, however, that the doctrine of accretion has no application to the Missouri River on account of the rapid and great changes con-

stantly going on in respect to its banks; but the contrary has already been decided by this court in Jefferis v. Land Company, 134 U. S. 178, 189. A question between individuals, growing out of changes in the very place now in controversy, was then before this court; and in the opinion, after referring to the general rule, it was observed: 'It is contended by the defendant that this well settled rule is not applicable to land which borders on the Missouri River, because of the peculiar character of that stream and of the soil through which it flows, the course of the river being tortuous, the current rapid, and the soil a soft, sandy loam, not protected from the action of water either by rocks or the roots of trees; the effect being that the river cuts away its banks, sometimes in a large body, and makes for itself a new course, while the earth thus removed is almost simultaneously deposited elsewhere, and new land is formed almost as rapidly as the former bank was carried away. But it has been held by this court that the general law of accretion is applicable to land on the Mississippi River; and, that being so, although the changes on the Missouri River are greater and more rapid than on the Mississippi, the difference does not constitute such a difference in principle as to render inapplicable to the Missouri River the general rule of law.' "

For a further review of the common law authorities see Fowler v. Wood, 73 Kan. 511, and Bellefontaine Co. v. Niedringhaus, 181 Ill. 426.

The rules of law which fix the rights of the parties where a river changes its course by gradual, insensible accretions, and those which obtain in cases where, by what is called avulsion, the course of a river is materially and permanently changed, as laid down by the authorities cited and quoted from, have always been given recognition by this court. The only departure in that respect, so far as we can find, appears in Northstine v. Feldmann, 298 Mo. 364, a case decided in 1923 by Division Two, though it was by mistake credited to Division One. In that case, as disclosed by the records on file here, it was asserted on one side and denied on the other that the channel of the Missouri River between Franklin and Warren counties had changed its course through avulsion. That was the principally contested issue in the trial court. When the case reached this court on appeal, the Commissioner writing the opinion held, in effect, that the change in the course of the channel, if any, and the manner of any such change, were wholly immaterial, because the Constitution had fixed the middle of the channel as it existed in 1875 as the permanent and immovable boundary between the counties. The error of the holding is manifest. At common law such a boundary is more or less migratory, in that it may shift with the gradual shifting of the stream due to imperceptible changes occasioned by accretion and reliction on its banks, as has been heretofore pointed out. Now the boundary between Frank-

lin and Warren counties was originally fixed by statute. The Constitution merely confirmed the boundary *as defined by the statute* and made it impossible for the Legislature to change it without the consent of the people of the two counties. But the statute must be construed agreeably to the principles of the common law, nothing appearing in its context or otherwise to indicate the contrary.

"Statutes are but a small part of our jurisprudence. The principles of the common law pervade and permeate everything which is subject to legal regulation. Such law defines rights and wrongs of every description and the remedies for public and private redress. By its principles statutes are read and construed. They supplement or change it, and it adjusts itself to the modification and operates in conjunction and harmony with them. If words from its vocabulary are employed in them it expounds them. If the statutes are in derogation of it, it yields and bides its time; if they are cumulative, it still continues. Rules of interpretation and construction are derived from the common law, and since that law constitutes the foundation and primarily the body and soul of our jurisprudence, every statutory enactment is construed by its light and with reference to its cognate principles." [2 Lewis-Sutherland on Stat. Cons. (2 Ed.) sec. 453.]

The Northstine case, to the extent of the holding just referred to, should be and is overruled.

According to the settled rules of law which we have been discussing, the dividing line between Ray and Lafayette counties is that of the middle of the main channel of the Missouri River as it existed just preceding the avulsion of 1915. That line was the one located and platted by the county surveyors in 1922, and the correctness of their survey is not questioned in this proceeding. In this connection one other thought occurs. The location of the boundary between the two counties through the statutory proceeding had in the county courts of those counties was neither more or less than a judicial ascertainment of that fact. The judgments of those courts are probably without influence so far as private titles are concerned. But with respect to all public and governmental purposes which are subserved by dividing the State into political subdivisions known as counties, they are conclusive as against collateral attack.

As the conclusion which we have reached as to the location of the boundary between Ray and Lafayette counties disposes of all other questions raised on the appeal adversely to appellant, it follows that the judgment of the circuit court should be affirmed. It is so ordered. All concur.