## STULL v. UNITED STATES.
### No. 9425.

Circuit Court of Appeals, Eighth Circuit.
Nov. 9, 1932.

Frank W. Bartos, Stanley Bartos, and Otto E. Placek, all of Wilber, Neb., for appellant.

Robert Van Pelt, Asst. U. S. Atty., of Lincoln, Neb (Charles E. Sandall, U. S. Atty., Edson Smith, Ambrose C. Epperson, and Lawrence I. Shaw, Asst. U. S. Attys., all of Omaha, Neb., on the brief), for the United States.

Before STONE, KENYON, and VAN VALKENBURGH, Circuit Judges.

VAN VALKENBURGH, Circuit Judge.

This is a suit to quiet title to certain Nebraska lands. The following facts were found by the trial court:

"1. That on June 21, 1912, T. Herbert Pollock and Lydia P. Pollock, husband and wife, deeded with full covenant of warranty to the plaintiff the following described real estate: All of that part of fractional section 6 south of the Platte River and lying northeasterly of the right-of-way of the Burlington and Missouri River Railroad in Nebraska, or its grantee and assignee, the Chicago, Burlington & Quincy Railroad, and south of the bridge or culvert immediately north of Swallow Point in Township 12 North of Range 14, East of the Sixth Principal Meridian, together with all accretions thereto, and plaintiff was the owner of this land when the bill was filed.

"2. That on June 21, 1912, Frank E. Schlater and wife deeded to T. Herbert Pollock with full covenant of warranty with a warranty that they were lawfully seized of the premises, the following described real estate: All of that part of fractional section 6 south of the Platte River and lying northeasterly of the right-of-way of the Burlington and Missouri River Railroad in Nebraska, or its grantee and assignee, the Chicago,

Burlington & Quincy Railroad, and south of the bridge or culvert immediately north of Swallow Point in Township 12 North of Range 14, East of the Sixth Principal Meridian, together with all accretions thereto.

"3. That on or about May 8, 1901, the Oreapolis Company deeded to the heirs of John Stull, deceased, that part of Lot 3 in Section 6, Township 12 North of Range 14, East of the Sixth Principal Meridian, lying East of the Chicago, Burlington & Quincy Railroad right-of-way, and north of the bridge or culvert immediately north of Swallow Point.

"4. That a deed of conveyance was made to defendant as grantee on September 7, 1915, signed by M. Archer, as referee, the deed reciting that in an action in partition in the District Court of Cass County, Nebraska, wherein Anna Amelia Monroe was plaintiff and John Frederick Stull, et al., were defendants, for the partition of the lands thereinafter described in the deed, M. Archer was appointed as referee to make the partition, and was ordered by the court to sell the lands for cash and that in pursuance of the order, he offered and sold for cash to C. Lawrence Stull all of Lot 3 in Section 6, Township 12, Range 14, East of the Sixth Principal Meridian, lying east of the right-of-way of the Chicago, Burlington & Quincy Railway which lies north of the bridge or 'culvert' immediately north of Swallow Hill point in Cass County, Nebraska."

The court further found that the Platte river, an unnavigable stream, lay to the north and east of the lands last above described. That between 1912 and 1919 this river by gradual process changed its position toward the north and east, and thereby built up lands by the slow and gradual process of accretion. That in 1919, by an avulsion, the Platte river suddenly changed its course so that it ran far to the north of its former lines.

In its petition the government alleges that appellant claims some right, title, or interest in and to that part of lot 3 in section 6, township 12 north of range 14 east of the Sixth Principal Meridian, lying east of the Chicago, Burlington & Quincy Railroad right of way, and north of the bridge or culvert immediately north of Swallow Point. It prays that title to all the land acquired by it, as hereinabove set forth, together with the accretions thereto, shall be forever quieted in it. By paragraph 6 of his answer appellant asserted title, by actual, open, continued, exclusive, adverse possession, for more than ten years immediately preceding June 21, 1912, to that part of government lot 3, section 6, township 12, range 14, in Cass County, Neb., more particularly described as follows: "Beginning at a tree on the former bank of the Platte River which bears South 25 degress 24 minutes East 1410 feet from the Northwest corner of Section 6-12-14; thence South 54 degrees West 75 Feet along an old wire fence to the Easterly right-of-way line of the C. B. & Q. R. R.; thence Northwesterly along said right-of-way line to a point due East of the center of the bridge or culvert immediately North of Swallow Point; thence East 24 Feet to the old River bank; thence Southeasterly along said old River bank 216 feet to beginning, containing 2/10 of an acre."

Upon trial the court found that by stipulation of the parties the word "culvert," as referred to in the deeds to which reference has been made, means a point at the intersection of the transverse axis of the railway bridge or culvert with the right of way fence of the railway company on the east side of this culvert or bridge. It found further: "That neither the defendant Stull, nor his predecessors in title, nor both of them, have had open, notorious, exclusive and adverse possession of any of the lands in controversy for ten years, nor of the strip south of the culvert and east of the right-of-way and north of the ancient fence, as alleged in paragraph six of defendant's answer."

The trial judge then proceeded to make a division of accretions between appellant and appellee in accordance with the following rules of law announced in his conclusions:

"2. Where accretions form to land bordering on running water, the riparian owners' boundary line still remains the stream on which his land originally bordered.

"3. An avulsion may cause a riparian owner to no longer be riparian.

"4. The proper rule to follow in dividing accretions is to give the several riparian proprietors a frontage on the new shore proportional to the frontage on the old, connecting their respective points by straight lines."

But two assignments of error are urged in brief and argument. They are:

"1. The court erred in finding, 'That neither the defendant Stull, nor his predecessors in title, nor both of them, have had open, notorious, exclusive and adverse possession of any of the lands in controversy for ten

years, nor of the strip south of the culvert and east of the right-of-way and north of the ancient fence, as alleged in paragraph six of defendant's answer.'

"2. The court erred in applying the rule of law for the division of accretions to the facts as shown by the evidence and in entering a decree in favor of the plaintiff and against the defendant."

We consider them in the order stated. At the outset it must be borne in mind that no title can be acquired by adverse possession against the United States itself. The burden devolved upon appellant to prove such possession in him and/or his predecessors in title for a period of ten years prior to June 21, 1912, when the title of the government accrued. It will be noted from the foregoing findings by the trial court—and they comprise all the material conveyances to be found in the record—that the precise deraignment of title is somewhat casually shown. We are not advised what sort of title the Oreapolis Company had to convey, nor from whom derived, and the relationship between John Stull and appellant is not made to appear. We are not reliably informed as to the predecessors of appellant in this disputed title. One Harry Densmore testifies that he first became acquainted with the land around Swallow Point in 1892. His father then owned land in section 6. A barbed-wire fence was built about that time along the southern boundary of the triangular piece in controversy. It was stapled to posts and trees, and its remains were still visible when the trial was held. This fence was built between 200 feet and 300 feet south of the culvert. The Densmores claimed no land north of this fence. The witness at first testified that he had farmed the land north of this fence as a tenant of Mr. Stull, but later acknowledged his mistake, saying that the land rented from Stull lay west of this triangular piece.

Appellant, in his testimony, states that "he occupied the land about this fence since 1892. (It is conceded that he did own land in this immediate vicinity and north of the tract now in dispute.) He used it as a pasture. The land south of the fence was first occupied by Mr. Densmore, then Mr. Schlater, and then Mr. Schlater sold it to the Government. Since the Government owned it, it was used for a Rifle Range. When Mr. Densmore owned it, he broke up a lot of land about 15 or 20 acres and farmed it. Mr. Schlater put in clover and timothy. Part of it was used for pasture purposes all of the

time. Mr. Densmore and his boys built the fence in 1892, and they maintained it while they owned the land." On cross-examination he stated: "That he did not maintain the fence furtherest south, the 1892 fence, between 1900 and 1912, but that Mr. Fitzgerald and Mr. Schlater maintained it."

Frank E. Schlater testified that he purchased in 1900, and sold to the government in 1912, that part of section 6 hereinabove described. His testimony is thus transcribed:

"There was a fence on the north side of Lot 3, which was used to keep the cattle from going into the river, and was maintained by witness and Mr. Fitzgerald who was his partner in the cattle business. The fence was attached to trees and posts and ran along the right-of-way up to the river, and from there east along the right-of-way it ran northwest and then made a swerve to the southeast along the south bank of the Platte River. It commenced a little south of the Burlington right-of-way, and was located more east than south of the culvert, approximately 150 to 200 feet. * * *

"He considered the northern boundary of his land from 1900 to 1912 to be the Platte River. Immediately north of the fence located south and east of the culvert was the river. The fence wasn't right to the edge of the river, perhaps 20 or 30 feet back, to keep the cattle out of the river. There was just a little strip of land on the other side of the fence. It was on the river. Witness owned the land to the river. The fence was designated as the 'old fence' on exhibit '4.' The fence was there when witness purchased the land. In answer to the questions as to whether he claimed anything on the other side, he did not know as he did. He wasn't interested in that on the other side. * * *

"There was a gate through what he termed the private fence, and a roadway or trail from the gate on up toward the culvert which Fitzgerald used. That both the fence and gate were maintained by Mr. Fitzgerald and himself. That from 1900 to 1912 he never observed Stull using the land immediately north of the gate and the fence."

In 1920 appellant built another fence from the culvert east to the river. This fence runs along the northern part of this disputed tract, and, therefore, tends to discredit appellant's contention that the old barbed-wire fence along the southern boundary of the tract constituted the line between his land and that of the government. According to Schlater's testimony the latter

fence was maintained by himself and his partner, Fitzgerald. It was used and regarded, not as a boundary, but rather "to keep the cattle from going into the river." During the entire period of Schlater's ownership, from 1900 to 1912, "he never observed Stull using the land immediately north of the gate and fence." That is the triangular piece in controversy. There is nothing in the testimony to show that this old fence was ever regarded as a boundary 'or that Stull or his predecessors made claim of ownership in this two-tenths of an acre. The use made of it, if such use was made, falls short of that open, notorious claim of ownership essential to the establishment of title by adverse possession. Not only was the testimony too fragmentary and indefinite to support the claim of appellant, but there was in the evidence sufficient conflict, to say nothing of affirmative testimony favoring appellee, to justify the conclusion of the chancellor. His finding upon this phase of the controversy should not and will not be disturbed.

■■■ We turn next to the second assignment of error, which is that "the court erred in applying the rule of law to the facts as shown by the evidence." The rule itself does not seem to be in dispute. Indeed, it could not well be. We feel that the statement of the trial judge with respect to the applicable rule, and the principles adopted by him in making a division of accretions between appellant and appellee, cannot be improved.[1] He says:

"The principle of division of the accreted lands which has been adopted is to take the body the accretion which lies in what was formerly a long cove of the river, and to divide it among the owners of the shore lands of the cove. For this purpose the shore line of 1912 was adopted, as all land in question has grown by accretion from that shore. The limit of the lands to the northwest was the south shore of the Platte at and before the avulsion of that river which formed a new channel suddenly in 1919. The erosion of the Missouri River at the east has been considered and allowance made for the slight loss of some of the accretion in the ravages of that river. The division of the accretion lands has not been made by taking the thread of the Platte River as a new base, but as indicated, the south shore line of the Platte in 1919 has been used as the new base. The extreme curvature to the south of the south shore of the Platte just before it emptied in-

to the Missouri in 1919 requires this division, so that an unproportionate part of the shore line should not be given to the plaintiff. Moreover, the rule adopted is strictly in accordance with the rule adopted by the Supreme Court of the United States as stated in Johnston v. Jones, 1 Black, 209, 222, 17 L. Ed. 117, as follows:

" 'But as the views of the court have been misapprehended, and that misapprehension may mislead in other cases, we prefer to deal with the subject as if it were properly before us. The court below instructed the jury in the language used by this court when the case was here in 1855. Upon that occasion, it was intended to adopt the rule laid down by the Supreme Court of Massachusetts in 17 Pickering, 45, 46, 28 Am. Dec. 276, Deerfield v. Arms. That court said: "The rule is-1, to measure the whole extent of the ancient bank or line of the river, and compute how many rods, yards, or feet each riparian proprietor owned on the river line; 2, the next step is, supposing the former line, for instance, to amount to 200 rods, to divide the newly formed bank or river line into 200 equal parts, and appropriate to each proprietor as many portions of this new river line as he owned rods on the old. When, to complete the division, lines are to be drawn from the points at which the proprietors respectively bounded on the old, to the points thus determined, as the points of division on the newly formed shore. The new lines thus formed, it is obvious, will be either parallel, or divergent, or convergent, according as the new shore line of the river equals, or exceeds, or falls short of the old." It is further said: "It may require modification, perhaps, under particular circumstances. For instance, in applying the rule to the ancient margin of the river, to ascertain the extent of each proprietor's title on that margin, the general line ought to be taken, and not the actual length of the line on that margin, if it happens to be elongated by deep indentations or sharp projections. In such case, it should be reduced by an equitable and judicious estimate to the general available line of the land upon the river." To this rule we adhere.' "

See, also, opinion in Johnston v. Jones, 1 Black, 209, 222, 17 L. Ed. 117.

The rule governing the boundary lines of riparian owners is thus stated by Mr. Justice Brewer in Nebraska v. Iowa, 143 U. S. 359, 360, 361, 12 S. Ct. 396, 397, 36 L. Ed. 186:

"It is settled law that when grants of

---

[1] Opinion not for publication.

land border on running water, and the banks are changed by that gradual process known as 'accretion,' the riparian owner's boundary line still remains the stream, although, during the years, by this accretion, the actual area of his possessions may vary. * * *

"It is equally well settled that where a stream, which is a boundary, from any cause suddenly abandons its old and seeks a new bed, such change of channel works no change of boundary; and that the boundary remains as it was, in the center of the old channel, although no water may be flowing therein. This sudden and rapid change of channel is termed, in the law, 'avulsion.' "

The court in making the division adhered closely to the directions embodied in the decisions of the Supreme Court. It was contended by appellant that the shore line established by the survey of 1856 should be taken for the purpose of measuring the accretions involved. The court, however, adopted the shore line of 1912, the date when the government acquired title, because, as it says, "all land in question has grown by accretion from that shore." It will be observed that each of the deeds upon which the parties rely, in whole or in part, uses a common point, to wit, the bridge or culvert immediately north of Swallow Point, as a boundary mark. We think this selection by the trial court is warranted by the facts. No reason appears why the more remote survey of 1856 should have been adopted. The shore line of 1919, the date of the avulsion, was used by the court as the new base in making division of the accretions. It is not seriously contended that the measurements were not accurately made and the accretions, therefore, not properly apportioned upon the basis of the Platte river shore lines of 1912 and 1919.

It follows that the decree below should be affirmed, and it is so ordered.