## PRICE et al. v. HALLETT.

### Division Two, April 3, 1897.

|138 561|
|159 595|

|138 561|
|91a 471|

|138 561|
|173 202|
|175 ³275|
|176 ³352|

|138 561|
|101a ³152|

1. **Ejectment**: TITLE: POSSESSION: INSTRUCTION. An instruction that the plaintiff has failed to show title through the government's patent is not in conflict with another that plaintiff was entitled to certain lands if he and his grantors had shown ten years' actual and exclusive possession thereof under color of title.

2. ———: POSSESSION: INSTRUCTION. Where plaintiff bases his title on ten years' actual possession, an instruction for the defendant that such prior possession must be exclusive and adverse to the defendant and those under whom he claims, is proper, as setting forth the facts plaintiff is bound to prove in order to recover.

3. ———: PRACTICE: ESTOPPEL. An estoppel in pais must be specially pleaded. But where this is not done, but much evidence is admitted without objection detailing conduct that amounts to an estoppel, this court will not hold that an instruction on estoppel was improperly given. If objection had been made at the time the answer could have been amended so as to plead estoppel; and where this issue is not made in the trial court, it is too late to raise it here.

*Appeal from Chariton Circuit Court.*— HON. O. F. SMITH, Special Judge.

AFFIRMED.

*C. Hammond & Son, A. W. Mullins* and *L. Benecke* for appellants.

(1) The first instruction given for respondent is wrong and misleading. In effect, it tells the jury that appellants have entirely failed to show any title to the land in controversy. It is in direct conflict with the second instruction given for appellants, in which the jury are instructed that adverse possession, if found from the evidence for a period of ten years by Abrogast, vested in him an absolute title to the land. (2) There

VOL. 138 mo—36

was no evidence whatever to warrant the second instruction given for respondent. The uncontradicted evidence was that Cassabeer conveyed the land in controversy to Abrogast in September, 1869; that it became part of the Abrogast farm, and that Abrogast continued in the possession of all of the farm that remained for a period of ten years or more; that when this land was restored it was made back to the part of the farm that had not been cut away by the river; that appellants succeeded to the Abrogast possession; that Nunn, who sold to Hallett, had no possession certainly until 1888, if then, and never any color of title. "The grantee of the person holding prior possession succeeds to his rights; and the plaintiffs made a *prima facie* case and the defendant must show title or leave." *Dale et al. v. Faivre*, 43 Mo. 556. (3) No facts relied upon to establish an estoppel *in pias* were pleaded and no such issue made. The testimony that was relied upon to warrant this instruction was brought out in a controversy over a deed, whether or not it was originally written by Benecke for a certain number of acres, and afterward changed. *Bray v. Marshall*, 75 Mo. 327; *Noble v. Blount*, 77 Mo. 235; *Hammerslough v. Cheatham*, 84 Mo. 13; *Stones v. Richmond*, 21 Mo. App. 17.

*Tyson S. Dines* and *Crawley & Son* for respondent.

(1) The infant plaintiffs named in the petition had no standing in the court, for the reason that they did not sue by guardian or next friend, as provided by statute. R. S. 1889, sec. 1997, *et seq.* The mother, as natural guardian, had no authority to sue for them. *Sherwood v. Neal*, 41 Mo. App. 416; *McCarty v. Rountree*, 19 Mo. 345. (2) The change of the land in February, 1886, from the south side to the north side of the main channel of the Missouri river, made it

part of Chariton county from and after that date. R.
S. 1889, sec. 3067.   It follows, therefore, that the sale
made at Marshall, Saline county, in October, 1888, pur-
porting to foreclose the old school fund mortgage, and
the deed executed by the sheriff of that county to
Alfred Rector, from whom plaintiffs acquired their
pretended title, were mere nullities, and passed nothing
to the purchaser.   (3)   The evidence adduced at the
trial was very conflicting -as regards the identification
of the land in dispute, so as to leave grave doubts as to
whether or not any part of the lands occupied by de-
fendant is fairly embraced within the description given
in plaintiffs' deeds.   In such cases the identification of
the land becomes a question of fact for the jury, whose
finding upon it ought not to be disturbed.   *Dausch v.
Crane*, 109 Mo. 323.

*C. Hammond & Son* for appellants in reply.

(1)   The only objection made at the trial on the
question raised in the first point of respondent's brief
was to the right of the infant plaintiffs to sue by their
mother, Emma Price, as their natural guardian and
curator.   The plaintiffs were permitted to amend by
inserting the allegation, and the trial proceeded without
further objection on that ground.   The guardians and
curators of minors are the proper persons to appear for
them in all legal proceedings.   (2)   The river being
the boundary line between Chariton and Saline
counties, and having thus suddenly changed its course
the boundary remained in the middle of the old
channel, until the legislature by new enactment fixed
the boundary line in the middle of the new channel.
*Rees v. McDaniel*, 115 Mo. 145; *Cooley v. Golden*, 117
Mo. 33; R. S. 1889, ch. 44, sec. 2961.   (3)   Plaintiffs'
grantors having owned and being in possession of the

land when it washed away, the plaintiffs are entitled to it when it is re-formed. *Minton v. Steele*, 38 S. W. Rep. 746.

GANTT, P. J.—This record presents another case growing out of the erratic action of the Missouri River. The land in controversy is claimed to be a part of a large tract which originally was attached to Saline county on the south side of the river but by the action of the currents has been transferred to the north bank and attached to Chariton county.

The process of transfer plaintiffs claim was complete in 1886. The particular portion of said land forming the basis of this action is the north half of the north half of the southwest quarter of section number 25, township 53, range 20.

If plaintiffs are right in their contention this land was originally a part of "Horse Shoe Bend" near New Frankford, in Saline county, between Glasgow and Brunswick. This "bend" included in the government survey parts of sections 23, 24, 25, and 26, range 20. The east half of section 25 was bounded by the river and was fractional. The west half was full. A plat of the original survey accompanies this opinion.

The evidence of plaintiffs tended to prove that the river began cutting away all the land on the west side of this "bend" many years ago, and in 1869 had cut away all of fractional section 26 and a large part of the west half of section 25. In that year, the evidence tends to show, one John Cassabeer was in possession of and claimed to own the remaining part of the north half of the north half of the southwest quarter of sec-

Neill Cabin is 23 Chains and 63 Links West, and 3 Chains and 63 Links South of Centre of Section 25, Township 54, Range 20, and in Northwest quarter of the Southwest quarter of said Section 25.

Nunn Dwelling is 300 Links North of Line through Centre of Section 25, Township 53, Range 20. Nunn Dwelling is the Southwest quarter of the Northwest quarter of said Section 25 and very close to the East Line thereof.

Price vs. Hallett.

Missouri River South Shore Line of Survey of 1816

PRESENT CHANNEL No. River.

Section Line between 25+26        Section Line between 23+24.

Andersons.

Benchmann

SE 28 53 19

Corner placed by Surveyor of Sol.ine G.W.Latimer
NW Quarter of Sec 25 T 53 R 20.

Section line bet 24+25

corner placed by G.W.Latimer
Stake

Stake

BN Fence 3.5E
Neil Co bin
Nunn Dwelling
Fence 3.5 R E
Nunn
Fence

N ½ Sec. NE¼ Sec 24 T 53 R 20
3 ½ NE¼ Sec 24 T 53 R 20

Simons
Simons        Wilhite.

Original Corner of Survey of 1816
Original Shore line caoth
White
Now Conxell
Ydtester

Brown

Higher ground Pond
Sand bar
Stake on Sand bar

traced

Variation Used 5° 40' East.

tion 25.   On the first day of September, 1869, Cassa-beer and wife by warranty deed conveyed said last named tract to Frederick Abrogast.   Abrogast was already in possession of and claimed to own the frac-tional east half of section 25 and some other tracts.   He had a farm with dwelling house and other farm build-ings, and had a portion of it in cultivation.   He con-tinued in possession by himself and tenants until the most of his farm, including the twenty acres purchased of Cassabeer, was washed away by the river.   Some time prior to 1878 the river had completely submerged the Cassabeer tract and all of the Abrogast farm save about thirty acres, and a small strip of the original "Horse Shoe Bend."   About this time the river cut through the bend on its south or Saline county side, and thereupon sandbars began to form anew the "bend" on its west side.   For some time, however, a channel of the river ran around the north end of the "bend," but gradually a large tract had formed to the west and adjoining the "bend" and the river ceased altogether to flow between the "bend" and the Chari-ton county shore.   These alluvial formations soon be-came valuable cultivating land.   The defendant and others squatted on these newly made lands, and their claim thereto is based entirely on adverse possession, without paper title thereto.

During the time Abrogast was in possession, to wit, on the twelfth day of February, 1873, he executed a mortgage conveying said farm, including the Cassa-beer tract or land in suit, to Saline county to secure $1,000, borrowed from said county, and stipulated therein "that should default be made in the payment of the principal and interest, or any part thereof, at any time, it should all become due and payable accord-ing to the tenor and effect of the bond thereby secured, and *the sheriff of Saline county* was authorized without

suit to proceed to sell the said mortgaged premises to satisfy said debt and interest thereon.''

Abrogast made default, and thereupon, on the fourth day of September, 1888, the county court of Saline county, by its order of record, found that said Abrogast was indebted to said county for the use of said school funds in the sum of $859.60, and that default had been made, and thereupon ordered that judgment be entered for said sum against Abrogast and his sureties, and made its order of sale of said property in said mortgage described to satisfy the same, and thereafter said order and judgment was duly certified to the sheriff of Saline county by the clerk of said court and was delivered to said sheriff on the sixth day of September, 1888, commanding him to levy the same on said real estate, and to sell the same according to law to satisfy said debt, interest, and costs, and thereupon said sheriff gave twenty days' notice of the time, terms, and place of sale, and the real estate to be sold, in a newspaper published in Saline county, and in pursuance thereof on the nineteenth day of October, 1891, by virtue of said execution and notice, sold said real estate at public vendue to the highest bidder at the courthouse door in the city of Marshall in said Saline county, during the session of the circuit court, and at said sale Alfred Rector became and was the highest and best bidder therefor and the same was struck off and sold to him, and thereupon said Rector, having paid said bid, the sheriff executed, acknowledged, and delivered his sheriff's deed to said Rector.

Afterward said Rector sold and conveyed said real estate to Sterling Price, the husband of Emma Price, the plaintiff, and father of the other minor plaintiffs. On the second day of January, 1890, and during his lifetime, Price sold and conveyed one undivided fourth of said lands to plaintiff, L. Benecke. The evidence

tended to prove that Price took possession of the orig-
inal Abrogast land thus acquired by him, had part of
it cultivated, and pastured a part thereof, and contin-
ued in possession until the present controversy arose.

After the land that had formed west of where the
bend once was, had become fit for cultivation, a num-
ner of persons settled upon different parts of it, princi-
pally *north* and *west* of the Abrogast land.

Those parties seem to have squatted upon the land
and made claims to it without regard to section or other
prior lines, but cut out their lines through the willows
by common agreement among themselves. The de-
fendant in this case bought the possession and right of
one of these squatters, and while he has pleaded no
estoppel *in pais* much evidence was heard in his behalf
to establish such an estoppel against the plaintiff
Benecke as to his claim for the undivided one fourth.

These squatters employed Mr. Carter, the county
surveyor of Chariton county, to survey these lands for
them which he testifies he did from the original field
notes locating the land in Saline county. Neither
Price nor his wife nor children had anything to do with
this survey or any of the agreements of these squatters.
The evidence tends to show that Frank Nunn was one
of these original squatters and his claim fell on the
extreme eastern side of these newly made lands where
the survey closed. Nunn sold to Hallett, the defendant
in this case, and showed him one hundred and sixty
acres of which Nunn claimed to own three fourths and
Benecke one fourth, which he said Benecke was to have
for services to the squatters.

Prior to the delivery of Nunn's deed to Hallett a
controversy arose about the description of the land.
Nunn and Hallett went to Brunswick to have Benecke
write the deed but Benecke being absent they went to
Messrs. Hammond & Son and undertook to give the

description. This deed was left in Messrs. Hammonds' office for Mr. Nunn to sign. Before it was signed a mistake was discovered in it and at their request Benecke prepared another deed from a description prepared by the surveyor Carter calling for forty-four acres. This deed was executed October 16, 1890, and was left with Benecke to be recorded.

Several months after the preparation of the deed Nunn and Hallett went to Benecke's office to get the deed and Hallett was then to pay for it. At that time Hallett and Nunn claimed this deed had been changed since its execution so as to convey a less number of acres than as originally written. Benecke denied any such change had been made. Hallett took this deed conveying three fourths of forty-four acres and says they had another deed prepared but the only other deed in evidence is one executed by Nunn to Hallett September 21, 1891, after this litigation had been commenced. Nunn, however placed Hallett in possession under his purchase.

The evidence also discloses that in the spring of 1888 one Neal settled on a part of this newly made land and built a cabin on the tract now in controversy. There is a conflict as to how he was there, whether in his own right or under Nunn. He claimed to be in his own right and after raising a crop sold his cabin and claim to Price and Benecke, and made them a deed. In the spring of 1891 Price and Benecke leased the southwest quarter of section 25, township 53, range 20, which includes the land in suit and the Neal cabin, to Jenkins and Sullivan by written lease of date February 14, 1891. Jenkins and Sullivan repaired the Neal cabin and moved into it. About this time defendant Hallett moved to the Nunn tract. Hallett got possession of the cabin from Jenkins and Sullivan, and Price and Benecke began a suit of forcible entry and

detainer.    That suit was sent to the circuit court of
Chariton county and by change of venue was sent to
the circuit court of Callaway county and was still
pending when this case was tried in Chariton county.
Sterling Price died after the trial of the forcible entry
case before the justice of the peace.    This action of
ejectment was commenced by his heirs and L. Benecke
against Hallett, was tried in 1893, and resulted in a
judgment for defendant from which plaintiffs appeal.

The jury having found the issue of fact for defend-
ant, the appellants insist their verdict was induced by
erroneous and contradictory instructions.    The pro-
priety of the verdict must be determined by an exami-
nation and comparison of these declarations of law.

1.    The first assignment is that the first instruc-
tion for defendant is wrong and misleading in that it
instructs the jury that plaintiffs failed to show any title
whatever to the land in controversy and is in conflict
with plaintiff's second instruction.

Said instruction numbered 1 for defendant was in
these words:    "The court instructs the jury that it
appears from the evidence in the case that the patent
for the north half of the southwest quarter of section
25, township 53, range 20, in Saline county, Missouri,
was issued by the government of the United States to
one Jonathan Millsaps and that plaintiffs in this case
have entirely failed to show that the title so granted by
the government to said Millsaps was ever conveyed to
the plaintiffs or any of them, or to any person under
or through whom said plaintiffs claim."

The second instruction for plaintiffs was as fol-
lows:    "If the jury find from the evidence that the
tract of land in controversy, to wit, the north half of
the north half of the southwest quarter of section 25,
township 53, range 20, was conveyed to Fred Abro-
gast in the year 1869 by John Cassabeer, and that said

tract became and was part of an entire tract of land known as the Abrogast farm and described as the southeast fractional quarter, the southeast quarter of the northwest quarter of section 25, township 53, range 20, and that said Abrogast, by himself and his tenants, was in the actual possession of said farm, claiming and holding the same as his own, adversely to all other claimants, and continued in the actual, open, notorious possession of the same for ten years after the date of said conveyance by said John Cassabeer, then the title became vested absolutely in said Abrogast, and if the jury further find from the evidence that by the encroachments of the Missouri river upon said land, described above as the Abrogast farm, while it was held and owned by said Abrogast or his grantees, a portion of said land formerly including the land in controversy was washed away, but that a portion of said farm remains unaffected by the action of the waters of said river, and that afterward by the natural action of the waters of said river, the land in controversy has been re-formed as originally located, and also has been deposited at and against the Abrogast land remaining and not washed away by the river, then said Abrogast and his grantees became and are the owners of said land.''

We are not able to concur in either of the criticisms of the first instruction given for defendant. In our judgment it simply tells the jury that the plaintiffs failed to deduce a paper title to the land from the original patentee, Millsaps, and it was a fact they had failed in so doing. It nowhere tells them that plaintiffs might not have acquired a title thereto by purchasing the possessory right which had ripened into a title in Abrogast.

Had the two instructions been connected with the disjunction ''but'' any supposed inconsistency would

have vanished at a glance. Taken together the court simply instructed the jury that plaintiffs had not shown a paper title through Millsaps, the original patentee, but that was not essential to their recovery if they found that Abrogast entered the land under claim of title through his deed from Cassabeer and had held the open, notorious, adverse possession thereof for ten years; that such possession would authorize them to recover.

2. It is next urged that there is no evidence whatever upon which to base defendant's second instruction, which was in these words: "Before plaintiffs can recover upon the ground of a prior possession of the land sued for, or any part of said land, plaintiffs must not only prove the fact of such prior possession, but must also prove to your satisfaction that such prior possession was exclusive and adverse to the possession relied upon by the defendant in this case, and if you believe that such prior possession relied upon by plaintiffs was not exclusive and adverse to the defendant and those under whom he claims, then such prior possession of plaintiff cuts no figure in this case, and you must find for the defendant."

It is objected that there was no evidence upon which to base this instruction, but it seems to us that this is a misconception of its purpose. Is it not rather a declaration of what facts plaintiffs were bound to prove in order to recover, rather than any assumption of what defendant had shown? Defendant unquestionably had a possession for several years, and the burden in the very nature of the case was upon plaintiffs in the absence of a paper title to show title by possession of the specific tract in suit. We can discover no legal objection to this instruction.

3. The third instruction for defendant is also challenged. It is as follows: "If from the evidence, you

believe that on the tenth day of September, 1890, the
defendant Daniel Hallett, and one Frank Nunn, con-
cluded negotiations whereby said Nunn agreed to con-
vey to Hallett 120 acres of land, including the land in
controversy, at the agreed price of $275, and that said
120 acres was part of the 160 acres, of which plaintiff,
Louis Benecke, owned at that time an undivided one
fourth, and if you further find that said parties under-
took to carry out said agreement and to consummate
said sale and conveyance on that day, with the knowl-
edge and acquiescence of plaintiff, Louis Benecke, and
that it was the intention and purpose of said Frank
Nunn to convey all his interest and claim in and to said
120 acres to said Hallett by the deed that day written
by plaintiff, Louis Benecke, and that said Benecke
knew and acquiesced in the said intended conveyance,
and that said Hallett paid $275, and accepted the deed
so written, believing at the time that it did in fact convey
all of Nunn's interest in and to the 120 acres of land,
and if you further believe that said Hallett afterward
took possession of said 120 acres of land under his
said purchase from Nunn, and continued in possession
thereof until the commencement of this suit, then the
court declares the law to be that said Louis Benecke is
estopped and precluded from maintaining this action
against said Hallett, no matter whether the deed writ-
ten by him for Frank Nunn on said tenth day of Sep-
tember, 1893, actually and correctly described said
land or not."

The theory of this instruction is that Benecke, one
of plaintiffs, is estopped. The objection is now made
that this instruction should not have been given be-
cause no such estoppel *in pais* was pleaded.

It has often been decided by this court that estop-
pel *in pais* must be pleaded. *Bray v. Marshall*, 75 Mo.
327; *Noble v. Blount*, 77 Mo. 235; *Avery v. Railroad*, 113

Mo. 561. It was so held on an objection to testimony in *Bray v. Marshall, supra*. In *Noble v. Blount*, it was said there was neither a pleading or evidence to justify such an instruction. It seems to us this doctrine has peculiar weight when invoked against the admissibility of evidence when no issue of estoppel has been tendered in the pleadings, or when an estoppel *in pais* is urged for the first time in this court, but where parties have permitted an issue of this kind to be raised by the evidence without objection and have had full opportunity to try the issue we are unable to draw a distinction between such a case and those cases in this State in which parties have neglected to file replies, and this court has held that it was too late after trying the case as if a reply had been filed to claim that the answer was admitted. Had a timely objection been made when this evidence tending to show an estoppel was offered as against Benecke, it would have been excluded, or the court would have permitted an amendment pleading such estoppel, but no such objection appears to have been made at that time and now that the evidence has been heard and the instruction given upon it, we think it is too late to raise the question of pleading on that point. We shall treat the record now as if the amendment had been prayed and permitted. *Baker v. Railroad*, 122 Mo. 533; *Darrier v. Darrier*, 58 Mo. 222.

It has been held in New York under the code that where an amendment to a pleading might have been ordered by the court on trial it may even be amended on appeal so as to conform to the proofs. *Hudson v. Swan*, 7 Abbott's New Cases, 324; *Bate v. Graham*, 11 N. Y. 237. Was there substantial evidence tending to prove an estoppel against plaintiff Benecke? We think there was. Of course its credibility was for the jury, but if credited by them it tends strongly to show that

Benecke was silent when he should have spoken. If Nunn and Hallett are to be believed they went to Benecke, to draw the deed from Nunn to Hallett; that Nunn said Benecke was to receive an undivided fourth for his fee for sustaining their title and that the deed was to convey one hundred and sixty acres of land and Benecke agreed to take the the "L" fourth of the tract and offered to sell his share that day to Hallett; that he made no claim of title or ownership from any other source and that they traded with this understanding. Even if these semi-amphibious squatters, who were evidently illiterate, were mistaken about the number of acres described by the deed, still there was no claim by Benecke of a title other than that he was to receive from these same squatters for serving them. Surely he can not be heard after remaining silent without asserting a claim at that time, now to urge another claim which he then had. We do not think the court erred in giving the instruction on estoppel.

4. Finally it is urged that all the evidence went to show this was the Abrogast land.

Whether this land was the north half of the north half of the southwest quarter of section 25, township 53, range 20, was a question of fact. The surveyor of Chariton county undertook to survey it as a part of Chariton county, according to Saline county surveys. According to the Chariton county survey there is no land corresponding to the description given in the petition. There was no such section as section 25, township 53, range 20, on the north side of the river. The surveyor of Chariton county says the government never surveyed the bed of the river. He says this land is evidently all "made land." It shows plainly that the river once ran where it now is. Now, if plaintiffs had title to this land which all the evidence shows was once entirely washed away and the river ran where the land now is,

it vested in them solely as an accretion to that portion of the Abrogast farm which never washed away. Unless it was formed to such tract as an accretion plaintiffs have no title thereto. The mere fact that it now forms a tract within lines that once inclosed the original Cassabeer tract will not give title. *Hahn v. Dawson*, 134 Mo. 581.

The question of accretion was submitted to the jury in a most favorable instruction and the jury found against plaintiffs and the circuit court approved the finding. We can not say that there was such a clear case of accretion that the verdict was against the evidence. Whether this land was first formed as a sand bar and by receding waters became attached or whether it was formed by gradual accretion, we confess is by no means clear to us. Whether it first formed to the Chariton shore or to the remnant of the old Bend, we think is very uncertain, and hence we accept the verdict of the jury.

The judgment is affirmed. BURGESS and SHERWOOD, JJ., concur.