JOHN T. AKERS ET AL. v. FRANK D. STONER, Appellant.—7 S. W. (2d) 695.

Division One, May 18, 1928.

*Milligan & Thompson, Pross T. Cross* and *Blackwell & Sherman* for appellant.

*E. A. Farris* and *Lavelock, Kirkpatrick, Clark & Garner* for respondent.

ELLISON, C.—This land controversy grows out of a sudden shifting of the channel of the Missouri River between Ray and Lafayette counties in one night, in July, 1915. The plaintiffs, named Akers, sue at law in two counts. The first count is to quiet title under Section 1970, Revised Statutes 1919, against a number of named and unknown defendants; the second count is in ejectment against three of the same defendants. All of the defendants defaulted except one, the appellant Stoner.

The land claimed by the respondents is 341.43 acres described as being in Section 25, Township 51, Range 28, *Ray* County. They base their title on two certain patents from the County Court of Ray County executed in March and November, 1923. The appellant resists, and claims the same land (except about fifty-nine acres) under three certain deeds from private owners severally dated in 1903, 1904 and 1914, calling for 239.14 acres of land in Sections *27, 28; 33* and *34*, Township 51, Range 28, *Lafayette* County. He asserts the land described in these deeds, with accretions, now amounts to 736 acres more or less. The discrepancy between the four section numbers given in appellant's deeds and the section number 25 given in respondents' patents, is due to the fact that the Government surveys in Ray County and Lafayette County do not fit together. Section 25, Township 51, Range 28, extended west according to the Ray County numbering would substantially overlap the east half of section 28 and the west half of section 27 of the same township and range according to the Lafayette County numbering.

By the avulsion in 1915 the river cut off one of its loops at a place about three miles south of the territory here involved. It should be remembered from the outset that none of the evidence in this case is concerned with the present river channel. It all refers to the course of the stream around the loop before the avulsion. The respondents' title through the two Ray County patents must stand or fall on two propositions. The first is that the disputed land was a part of the bed of the Missouri River, or of an island formed in the

channel, as abandoned by the avulsion in 1915. Sections 7029 and 7032, Revised Statutes 1919, first enacted by Laws 1895, page 207, provide that all such land shall belong to the counties where located, and of course it devolved on the respondents to prove the land was formed in that way. They say it was abandoned river bed.

The second proposition to be established by respondents was that the land was *located in Ray County* at the time of the avulsion, at the time the patents were issued, and at the time the suit was filed. If the land was not in Ray County at the time of the avulsion then title thereto was not vested in that county under Sections 7029 and 7032, supra, by the sudden recession and abandonment of the river bed; if the land was not in Ray County when respondents' patents were issued, the patents passed no title; and if the land was not in Ray County when the suit was filed the Circuit Court of Clinton County had no jurisdiction. [Sec. 1179, R. S. 1919.] It should be here explained the respondents instituted the action in Ray County on the theory that the land was in that county, and that a change of venue was taken to Clinton County, making the jurisdiction of the circuit court of the latter county wholly derivative. But all this amounts to the same thing, for wherever the county boundary line was at the time of the avulsion, it remained and continued to be afterward, so far as the abandoned river loop was concerned; and so we can say that if the land was not in Ray County at the time of the avulsion the respondents' suit must fail for all three of the reasons above given. The fact is conceded by everybody that the avulsion did not change the boundary line to the place three miles south where the river cut through the loop. It remained where the law put it at the time of the avulsion. This point is so well settled we shall not cite authorities on it.

Ray County is north of Lafayette County, and in this instance also east where the river made the loop above mentioned. The boundary line is located by statute "in the middle of the main channel of the Missouri River." [Sec. 9328, R. S. 1919, G. S. Mo. 1865, p. 193, sec. 28; Sec. 9368, R. S. 1919, G. S. Mo. 1865, p. 203, sec. 98.] In trying the case the circuit court followed Northstine v. Feldmann, 298 Mo. 365, 376, 250 S. W. 589, which held that a county boundary set by similar statutes was definitely and immovably fixed by Sections 1, 3 and 4 of Article IX of the Constitution of 1875 at the place where the boundary stood when the Constitution went into effect and that the line did not shift with the gradual changing of the river bed. The undisputed evidence in the instant case showed that forty-five acres of the land in controversy was north of the middle of the main channel of the river as it flowed in 1875, and

hence the trial court treated it as a settled proposition that that much of the land was in Ray County. The only question left was whether the land was abandoned river bed. Finding it was, the trial court awarded the forty-five acres to respondents.

The appellant joined issue with respondents on the foregoing propositions. His contentions were: (1) that the disputed land was not abandoned river bed, but was part of the accretion to his farm before the avulsion; and (2) that the river had gradually shifted between 1875 and 1915 so that at the time of the avulsion the middle of the main channel was north and east of all the land in controversy. In connection with this second contention appellant maintained the county boundary moved along northward with the river channel as the latter gradually changed, and he vigorously assaulted the holding in the Northstine case to the contrary. This theory, of course, put all the land in Lafayette County.

Only recently the Northstine case was squarely overruled on the point at issue by Court en Banc in State ex inf. Mansur v. Hoffman, 318 Mo. 991, 2 S. W. (2d) 582, 584. This Hoffman case had in judgment the particular place and avulsion involved here. It was held the Constitution of 1875 did not supersede the common-law rule that *gradual* natural changes in a river channel work corresponding changes in a boundary line marked by the river. The specific conclusion was that the middle of the main channel around the loop just prior to the avulsion in 1915 was the boundary between the two counties. This being so, the case at bar will at least have to be reversed and remanded, because, with the issue sharply presented by the pleadings and evidence, the circuit court gave a declaration of law for respondents conforming to the repudiated theory of the Northstine case and refused one for the appellant embodying the rule approved in the Hoffman case. [Campbell v. Greer, 209 Mo. 199, 108 S. W. 54.] And if the record shows there was no substantial evidence warranting respondents' recovery on the correct theory, i. e., if there was no evidence that any part of the land in dispute was north and east of the 1915 channel—the case must be not merely reversed and remanded but reversed outright. [King v. Mann, 315 Mo. 318, 327, 286 S. W. 100.] We think the latter is true, as we shall proceed to show.

The nature of the case and the vagueness of the testimony make it difficult to give a clear statement of the facts. To convey a rough idea of the situation as we gathered it from the record, we have caused the attached plat to be drawn as a composite from various maps offered in evidence. The plat does not agree accurately with any one

of the exhibits, but sets out our understanding of the topographical history of the area.

The curve described by the Missouri River at the place in question prior to 1915 was a rather sharp horseshoe curve with its convex side to the north or northeast. Only a small part of the whole curve is shown on the plat. All the land involved was close to its vertex. The United States Government made a survey of the river in 1878. Maps or sketches based on this survey were introduced in evidence by both parties, and it was agreed, or at least not disputed, that the course of the river then was as it had been three years before in 1875. The river at that time, as will be seen from the plat, did not swing so far to the northeast. The south bank appears to have been about coincident with the north side of the land described in appellant's deeds, and the stream was about half a mile wide with some islands at the center of Section 25 and southeast of there (not shown in the plat). The line marked ''C. L. Channel 1878'' was not the center line of the channel by width, but ran much closer to the north bank and represents the deepest navigable channel as shown by the Government survey. The circuit court awarded to respondents that part of the land claimed by them which was east of this channel line.

Between 1878 and 1915 the river gradually shifted to the north and east. There is no dispute about that. The south bank moved north a maximum distance of about one-fourth mile near the west

side of section 25 and from there southeast tapered down until the 1915 and 1878 south bank lines were the same substantially a quarter of a mile south of the southeast quarter of section 25. The north bank apparently veered to the north a half mile or so from its former location and thence swung around in a semicircle more than a mile to the east and south of section 25. But it is not to be understood this whole area was open water.

It seems an island (not shown on the plat) was formed directly north of appellant's land, with a part of the channel between it and the shore now represented by the narrow slough running northeast on the plat. A triangular sandbar spread out from the south bank, where the northeast part of appellant's land is now, and another large island formed east of his land, marked "Lena Waller Island" on the plat. Part of the river current went around the north, east and south sides of this island, and part continued to flow on the west side substantially where the north and deeper part of the 1878 channel had been.

The controlling question in the case is whether the channel around the east side of Waller Island was the *main channel* at the time of the avulsion in 1915. If the west channel was the main one there might be some room for contending part of the disputed land was on the Ray County side of it, but on that point the proof is all the other way. There was substantial evidence it is true that the channel on the west side of the island was open in 1915; that it was as much as one-fourth mile wide from shore to shore; that Lafayette County surveyed Waller Island in 1914 and sold it as an island; and that on several occasions that year, or shortly previous, steamboats used the channel on that side in times of high water. But it was never contended by respondents that the west channel was the main channel. One of respondents' witnesses referred to it as being a "slough" in 1915; another said it carried about a *third* of the water of the river; and respondents say on page 10 of their brief: "The evidence shows that between 1877 and 1915 the left bank of the river had been pushed to the north and east and that the *main channel* then ran around the north and east sides of Waller Island." (Italics ours.) It was not seriously denied, also, that at the time of the trial in 1924 this west channel was filled up practically along the entire east side of section 25, whereas the abandoned channel around the east side of the island is still a lake of considerable size, as shown by the plat. And in 1922 the two counties caused a survey to be made to establish the boundary line, and it was put along the inside of the east channel. We have not shown it on the plat.

And so we conclude, without referring to the evidence for appellant at all, that at the time of the avulsion in 1915, "the middle of the main channel" of the river, the boundary line fixed by statute,

was on the north and east sides of Waller Island, which put *all* of the land in dispute well to the south and west in Lafayette County. This necessitates a reversal of the case and makes it unnecessary to consider other questions presented.

The judgment is reversed. *Lindsay* and *Seddon, CC.,* concur.

PER CURIAM:—The foregoing opinion by ELLISON, C., is adopted as the opinion of the court. All of the judges concur.