A. M. RANDOLPH v. MOBERLY HUNTING & FISHING CLUB and D. C. PHILLIPS, Appellants.—15 S. W. (2d) 834.

Court en Banc, February 11, 1929.

*F. C. Sasse, M. J. Lilly* and *Lamb & Lamb.* for appellant.

998

*Roy B. McKittrick* and *Grover & Graves* for respondent.

WHITE, C. J.—The plaintiff filed his petition in the Circuit Court of Saline County April 6, 1925, in two counts: the first in ejectment, and the second praying the court to determine title. The land involved is thus described:

The Northwest Quarter of Section 19, Township 53, Range 19; and the Southwest Quarter of Section 24, Township 53, Range 20; all in Saline County.

To this petition defendant filed an amended answer setting up numerous defenses which can better be understood by first explaining the situation of the land.

It lies on the north side of the Missouri River. Under the General Statutes of 1865, the county line between Saline County and Chariton County was fixed as the middle of the main channel of the Missouri River.

When this land was first surveyed by the United States Government in 1816, the Missouri River at that point flowed in a curve around to the north in a sort of horseshoe bend, forming a peninsula extending from Saline County into Chariton County. At that time the greater part of the land in dispute was probably in the river, and possibly all south of the middle of the main channel. The peninsula within the bend extended three or four miles to the north. Some part of the north tip of the peninsula was called ''Saline Point.'' In the course of time the force of the water gradually wore away the neck of the peninsula and widened the expanse of land towards the top. Land was taken into the river from the right and left, and accretions accrued to the land within the bend. This wearing away of the neck continued until 1879, when the river suddenly abandoned the bend and cut straight across, leaving all the land within the peninsula, including the land sued for, on the north side of the river.

Plaintiff claims title by quit-claim deed from Saline County, on the theory that the land formed by recession of the river became the property of the State and was granted to Saline County by the Act of 1895. The order to sell by the County Court of Saline County and the deed to plaintiff covers 2491 acres.

The amended answer challenges the jurisdiction of the Circuit Court of Saline County to entertain the case on the ground that the land is in Chariton County.

It pleads laches and estoppel on the ground that, since what is is called the ''cut-off'' in 1879, Chariton County has exercised exclusive jurisdiction over the territory north of the river including this land.

Other defenses are set up in the answer which are more or less repetitions of those two. The Statute of Limitations is also pleaded, and still other defenses which it may not be necessary to consider.

The first Government survey was made from the south while the land was on the south side of the river, in which at least one of the tracts in dispute was surveyed and described as above. A United States Government Survey in 1890 was made from the north side. These two surveys conflict. In 1898, nineteen years after the cut-off, Chariton County caused the land to be surveyed as a part of that county. This survey agrees with the government survey of 1890. In the later surveys this land is described as Lot 3, Southeast Quarter

Section 27, Township 53, Range 19; Lot 1, Northeast Quarter Section 34, Township 53, Range 19; Lot 2, the Southeast Quarter of Section 34, Township 53, Range 19; all in Chariton County.

The plaintiff had previously brought a suit in Chariton County against the same defendants for the same land, by the latter description.

The defendant Hunting Club claims title to the land described in the petition as Northeast Quarter of Section 19, Township 53, Range 19, through a patent of the United States, and mesne conveyances, to part of Island 23, with accretions to the island. It also claims, as we gather from the record, that the Southeast Quarter of Section 24, Township 53, Range 19, never belonged to the State, but was partly on the mainland on the Saline County side, and partly accretions by recession of the river.

The United States Government owned all the land above low water bordering on the river; it also owned the islands. But land which occurred by the formation of islands in the river after admission of Missouri as a State in 1821, belonged to the State; lands caused by the recession of the river which did not accrue to riparian owners belonged to the State. By the Act of 1895 of the Missouri General Assembly all such lands which had been formed by the recession of waters of lakes and rivers were granted to the respective counties in which they were situated.

The facts upon which the defendant bases its defenses of laches, estoppel and want of jurisdiction, are as follows:

The Act of 1895, granting lands formed by the recession of waters to the counties, was enacted sixteen years after this particular land was on the north side of the river and within the territory over which Chariton County exercised exclusive jurisdiction. Chariton County thereafter continued to exercise exclusive jurisdiction over it.

The plaintiff introduced one A. F. Arrington who, in 1898, as County Surveyor for Chariton County, surveyed the land from which the waters had receded, and the plat of his survey was introduced in connection with his testimony. The land around the original bend which became dry land after the cut-off, was called "bar lands," of which the land in dispute is a part. The defendant offered depositions, and as witnesses in court, former sheriffs of Chariton County, former clerks of the county court, deputy clerks, prosecuting attorneys, probate judge, superintendent of schools, school commissioners, treasurers, collectors and assessors. The Probate Court of Chariton County had entertained jurisdiction of all estates arising on all lands placed north of the river by the cut-off. All suits concerning such lands were filed in the Circuit Court of Chariton County. The sheriffs of Chariton County served processes on such lands concerning such suits, arrested persons charged with

crimes committed there, candidates for offices solicited votes from voters living there, and all voters voted at precincts in Chariton County. A school district was formed on that territory, called the Bar School District, and was in operation for twenty-five years prior to the filing of this suit.

Cases of the kind mentioned above were tried in Chariton County, with no question as to jurisdiction, and none were tried in Saline County except on change of venue. The officials of Chariton County assessed, levied and collected taxes on all the lands included in that territory. Public roads were established and bridges were built by Chariton County in the bar district. All this occurred during almost the entire time after the cut-off in 1879, and at no time during that period did Saline County or any official of Saline County attempt to exercise any official jurisdiction over that territory.

One J. E. Dempsey testified that he was deputy sheriff and sheriff of Chariton County from November, 1886, until 1897. He was familiar with the location of the Bar Lands. He said:

"I served papers there, made arrests in that territory, during all my term of office. I never knew of any crimes occurring in that territory being prosecuted in any other courts except the courts of Chariton County." Then he said:

"Since the river changed no offenses committed on this side of the river (meaning the Chariton County side, where his testimony was taken), were ever prosecuted in Saline County. I will say if there was I do not know about it and that holds good as to civil cases. The Missouri River has been the line ever since the change was made; in fact, ever since I can remember the Missouri River was considered the line between the two counties."

W. W. White, County Clerk of Chariton County for eight years, testified that township organization prevailed in Chariton County, and this territory was attached to townships of Chariton County. He said:

"No officer of Saline County ever had anything to do with the assessing and collecting of taxes on these lands. No officer of Saline County ever exercised any authority on this territory so far as I know.

"During all the time I have known these lands the Missouri River was regarded as the boundary line between Saline and Chariton County. The matter was never disputed until the year 1925."

J. W. Grizzell, a banker, as County Treasurer of Chariton County from 1905 to 1909, regularly collected taxes on this land. He said:

"The Missouri River was regarded as the boundary line between Chariton and Saline County. I have never heard of any other line between the two counties. *The whole business of the counties was administered with reference to this boundary.*"

One C. C. Parks, Deputy County Clerk for eight years, and County Clerk from January, 1909, to January 1, 1915, testified to collecting taxes upon this territory. He said:

"While I was in office I never heard of any claim being made that any part of these lands were in Saline County. The Missouri River was regarded as the boundary line between the two counties *for all purposes.*"

W. L. Wright, former circuit clerk, testified that suits between persons in this territory were filed in the Circuit Court of Chariton County and tried there. He said: "The Missouri River was regarded as the boundary between these two counties."

Many statements of like nature were made by other persons who had been officials of Chariton County. The only objection to this evidence was on the ground that it was irrelevant; no objection to any statement that the Missouri River was regarded as the boundary line between the two counties,. on the ground that it was a conclusion of a witness.

Chariton County, after the survey in 1898, sold off tracts of that land. From 1901 to 1924, no less than fifty-eight tracts were conveyed and paid for. Those tracts were bar land and concededly formed by recession of the river. The price received varied from one dollar per acre up to twenty-five dollars per acre, and one small tract sold in 1901 for $106.85 per acre. Much of this land was built upon and cultivated. Numerous photographs were introduced in evidence showing trees of large size, old houses, roads, a schoolhouse, and crops of various kinds on numerous well-kept farms, indicating that this bar land was occupied by residences, farms and other things as an old settled community.

Defendants did not stop there. It showed that in 1922 A. M. Randolph, the plaintiff in this case, appeared before the County Court of Chariton County and offered $1.25 per acre for the bar lands, which offer was accepted and a contract entered into to convey said lands to him for that price. He paid down twenty-five per cent. The county thereupon instructed the prosecuting attorney to bring suit for possession of all such lands as were held adversely, and suits were brought. The lands described in that contract are the same as the lands, 2491 acres, described in the deed from Saline County which the plaintiff offered in evidence to support his title in this case. Among the suits brought was one against the Moberly Hunting & Fishing Club, appellant here, for the land involved in this suit, but described according to the Arrington Survey, mentioned above, made by Chariton County.

The record of the Circuit Court of Chariton County offered in evidence recites the contract with the county court, the payment of twenty-five per cent purchase price, and the county court's instructions to the prosecuting attorney to bring suits to recover possession

of the land; that A. M. Randolph had given bond binding him to pay the balance of the purchase price for the land; that the county court in November, 1925, directed John D. Taylor, its attorney, to dismiss the cause, and accordingly it was dismissed.

The court further found that A. M. Randolph was ready and willing to comply with the terms of his purchase and was interested in the land, and that the County Court of Chariton County had not refunded to him the money paid as a part of the purchase price; that he was willing, ready and able to pay the purchase price, and that he would be barred by the Statute of Limitations from prosecuting said suits filed thereafter, and the court thereupon on motion of Randolph ordered the cause to be reinstated, and Randolph was made party plaintiff.

The record shows that thereafter plaintiff filed an application for change of venue, the change awarded and case sent to Saline County where it was still pending. The pleadings in that case were offered in evidence to show that, though differently described, it covered the same land as is involved in this case.

Transcripts were offered of seven other cases in which Chariton County was plaintiff and some individual defendant, describing other lands included in the deed under which plaintiff claims, and it was agreed between counsel that the records in such cases were exactly the same as that of Chariton County versus the Moberly Hunting & Fishing Club, except the description of the land involved. Such suits were for tracts of land in the bar district, filed by Chariton County in accordance with its contract with A. M. Randolph, dismissed by Chariton County, reinstated on motion of Randolph, who was made party plaintiff, and change of venue taken to Saline County.

One case filed in Chariton County, Benecke v. Welch, was a suit for possession of certain lands fronting on the Missouri River, formerly in Saline County, cut off in 1879 and placed north of the river. The case was carried through to a conclusion on the theory that the land was in Chariton County. It was decided in this court in 1902 (168 Mo. 267).

Price v. Hallett, 138 Mo. 561, was a suit for possession of a part of this land, formerly in Saline County before the cut-off, suit brought in Chariton County, and decided by this court in 1897. Chariton County retained jurisdiction and the case went through to the Supreme Court without jurisdiction being questioned.

I. The Revised Statutes of 1865 defined the line between Chariton and Saline counties as the middle of the main channel of the Missouri River. That does not mean that the line is fixed and invariable; it does not abrogate the common-law rule that the line shifts with the shifting of the channel. As the river gradually moves over, accretions may increase the land of a riparian owner on one side and wash away the land of a riparian

owner on the other side. But when a river suddenly abandons its course and seeks a new channel, it causes no change in the boundary between the landowners nor in the jurisdictions bordering upon the stream. By the cut-off in this case, or avulsion as it is called, the river suddenly left its former channel, cut through the narrow neck of the peninsula, left its old bed and a quantity of dry land on the north side of the river which formerly had been the south side. That cut-off of itself did not change the boundaries between Chariton and Saline counties from what they formerly were. [State ex inf. Mansur v. Hoffman, 318 Mo. 991, 2 S. W. (2d) 582; Akers v. Stoner, 319 Mo. 1085, 7 S. W. (2d) 695; Nothstine v. Feldmann, 320 Mo. 500, 8 S. W. (2d) 912.]

II. On the question of jurisdiction we have many adjudications by the United States Supreme Court settling disputed boundaries between states. [Maryland v. West Virginia, 217 U. S. 1; Indiana v. Kentucky, 136 U. S. 479; Louisiana v. Mississippi, 202 U. S. 1; Michigan v. Wisconsin, 46 U. S. Sup. Ct. Rep. 290; Virginia v. Tennessee, 148 U. S. 503.] In the Maryland-West Virginia case (l. c. 43) the court, quoting from the Louisiana-Mississippi case, said:

"The question is one of boundary, and this court has many times held that, as between the States of the Union, long acquiescence in the assertion of a particular boundary and the exercise of dominion and sovereignty over the territory within it, should be accepted as conclusive."

The court (l. c. 42) states the rule in relation to private parties who recognize a line as the proper boundary between their several tracts as being conclusive of the proper line.

In the Michigan-Wisconsin case the continued and uninterrupted exercise of jurisdiction for a period of sixty years was held conclusive as to the correctness of the boundary line.

In the Virginia-Tennessee case (l. c. 523), the court quoted:

"It is a principle of public law, universally recognized, that long acquiescence in the possession of territory, and in the exercise of dominion and sovereignty over it, is conclusive as to the nation's title and rightful authority." See also State of New Mexico v. State of Colorado, 267 U. S. 30.

In those cases the continued exercise of sovereignty over territory in dispute had been continued for long periods from fifty to one hundred years or more.

While those cases establish a rule as between sovereign states there is no reason why it should not be applied to counties, because counties are political subdivisions of the State and each exercises governmental functions within its territory, to the exclusion of an adjoining county.

The rule is applied to municipal corporations where territory is illegally connected with a city or detached from it. Long acquiescence in the status thus established estops such city, or any contesting municipal corporation, to dispute the line. In People ex rel. Colfax v. Maxton, 38 Ill. App. 152, affirmed by the Supreme Court (16 L. R. A. 178, 1. c. 179), a certain territory was illegally detached from a village and attached to a township outside the village. The proceeding was one by mandamus to compel the county clerk to extend the tax levy for the use of the village over the land in the detached territory. Seven years elapsed and within that time the township had opened a public highway, worked it, spent large sums of money on it, caused a bridge to be constructed, and had assessed relators for taxes for that purpose. The opinion closes with this statement: ''The village is estopped from claiming any power over the territory in question as being within its limits.'' State of Minnesota ex rel. Childs v. Crow Wing County Commissioners, 35 L. R. A. 745, and In re Section 6, 68 N. W. (Minn.) 323, are cases in point. These will be noticed below.

State ex rel. City of Minot v. Willis, 118 N. W. (N. D.) 820, was a proceeding by mandamus whereby relator sought to compel the Board of County Commissioner of Ward County to equalize the assessment of real and personal property claimed to be within the corporate limits of the city of Minot. It was claimed that the territory in dispute had been illegally segregated from the city limits. The court said (1. c. 821):

''From these facts the trial court found as conclusions of law that the territory in question was disconnected and excluded from the corporate limits of Minot on May 10, 1890, and ever since has remained disconnected therefrom; also, that from such date to 1907, the said city has acquiesced in such disconnection and exclusion, and is now estopped to question the validity thereof.''

The court affirmed the judgment, and in answering the argument that the doctrine of estoppel does not apply, said (1. c. 822):

''During all this time from May 10, 1890, until 1907, the city seemingly acquiesced in everything which was done, not only by the county, but by the township of Harrison, in recognition of the latter's claim to the territory in dispute, excepting the attempt in certain of the latter years to tax said property as a portion of the taxable property within the city.''

The court then recites the fact that the residents of the territory exercised no rights as electors, or otherwise, of the city, but voted in the township, and children residing in the territory were excluded from free access to the city schools, and said:

''Under this state of facts we are firmly convinced that the trial court did not err in its conclusion that the city of Minot by this long acquiescence is now estopped to claim that said territory was

not legally segregated from its corporate limits. . . . Public policy demands that the doctrine of estoppel should be invoked in such a case.''

In State ex rel. Reed v. Garden County, 170 N. W. 835, the Supreme Court of Nebraska had before it a *quo warranto* proceeding challenging the jurisdiction of Garden County over a strip of territory. The question was whether that territory was within Garden County or Grant County. Grant County had exercised jurisdiction over it from 1912 to the time of the suit. The court said (l. c. 836):

''My conclusion of law is that Garden County is prevented by the equitable doctrine of estoppel or laches from now claiming that the boundary line between Grant and Garden counties is the range line between ranges 40 and 41.''

In Ullman Brothers v. State, 79 So. 625, a proceeding to condemn and sell the land of defendant for taxes, taxes had been assessed by the Collector of Cherokee County for the year 1914. The landowners claimed that the land was in Calhoun County. The trial court permitted the State to show that the land was in a territory which had been recognized and treated as a part of the County of Cherokee, and that Calhoun County had made no attempt to exercise authority over its territory until the year 1914. This was assigned as error. The court said (l. c. 628):

''Here it is a matter of little or no importance to appellants whether their lands be situated in the County of Calhoun or the County of Cherokee, or whether they pay taxes to the one or to the other. On the other hand, it is of great importance to the public that the settled conditions that have existed for half a century be not disturbed.''

The court then quotes from the case of Indiana v. Kentucky, 136 U. S. 479:

''Long acquiescence in the possession of territory and in the exercise of dominion and sovereignty over it, is conclusive of the nation's title and rightful authority.''

The court applied that principle to counties.

State v. St. Louis County, 134 N. W. 1. c. 301-2, was a *quo warranto* proceeding which brought in question a boundary line between two counties, and it was held that acquiescence in a line for fifteen years forbade the consideration of a claim that the line was elsewhere.

In Edwards County v. White County, 85 Ill. 390, a county boundary line was considered. The court said:

''The quiet and good order of communities ought not to be disturbed by controversy in regard to such questions, after, at least the expiration of the period fixed for limitation of actions between individuals where title to real estate is controverted . . . because the public welfare forbids that the possibility of strife and con-

troversy in regard to boundary lines between counties should continue indefinitely.''

State ex rel. West v. Des Moines, 31 L. R. A. 192, was a *quo warranto* proceeding to test the right of Des Moines to exercise corporate authority over certain territory annexed to the city by a void statute, and it was held that the *status quo* would not be disturbed after four years of acquiescence.

In Union Township of Dunklin County v. Cotton Hill Township of Dunklin County, 294 Mo. 538, 243 S. W. 333, a proceeding in equity to determine the boundary line between Union Township and Cotton Hill Township, the determining factor in the circuit court was ''the uses and acceptances of more than thirty years of the division line between said townships'' (as described). Upon that this court said (l. c. 550), opinion by GRAVES, J.:

''The conduct of the two townships for the long number of years would show not only their understanding of the order (by which the boundaries were defined), but likewise their agreement upon the boundary line. Upon this last phase of the case we are not prepared to say that the trial court was wrong.''

In State ex rel. v. School District of Lathrop, 314 Mo. 315, this court applied to a disputed boundary of the respondent district the same rule that is applied to a case where the *existence* of a municipal corporation is challenged, such as appears in these cases: State ex rel. v. Westport, 116 Mo. 582; State ex rel. v. Mansfield, 99 Mo. App. l. c. 153; Stamper v. Roberts, 90 Mo. 683; State ex rel. v. Miller, 113 Mo. App. l. c. 665.

In the Mansfield Case, 99 Mo. App. l. c. 153, Judge GOODE, writing the opinion, said:

''We think every interest of the State, such as public peace, the security of person and property and the payment of city's debts, would be impaired rather than promoted by setting aside the incorporation at this late day.''

In Mullins v. Kansas City, 268 Mo. l. c. 460, this court said:

'' 'We take it that it is no longer a disputed question that the doctrine of laches applies to a county or a municipal corporation, as well as to individuals.' ''

Plaintiff argues that laches is available as a defense only in equity cases, and this is strictly an action at law. But in the Lathrop School District case, and cases cited in the opinion there, it was held to apply to *quo warranto* proceedings, as it was applied in several of the cases cited above.

Here we have the question of *estoppel in pais*. Is Saline County estopped to claim jurisdiction over the land in dispute? This is quite aside from the question of title. Saline County conceivably might have acquired title to the land under the Act of 1895, and might later have become estopped to claim governmental jurisdiction over it.

Estoppel *in pais* arises where one by his acts, representations or admissions, or *by his silence when he ought to speak out,* intentionally or *through culpable negligence,* induces another to believe certain facts to exist and such other relies and acts upon such belief and facts so that he will be prejudiced if the former is permitted to deny the existence of such facts. [21 C. J. 1152.]

Stated broadly, this is the rule between persons. We have seen about how it is treated between municipal corporations and political subdivisions.

What are the facts which would work an estoppel in favor of jurisdictional control by Chariton County?

The Act of 1895 provided that the land belonging to the State, not otherwise appropriated under the laws thereof, which have been formed by the recession and abandonment of "old beds of lakes and rivers in this State are hereby granted and transferred to the counties in which such lands are located to be held by such counties for school purposes." The Act was passed sixteen years after the cut-off. The land in question and the territory called the bar land had been on the Chariton side of the river for that length of time and Chariton County at that moment was exercising jurisdiction over that territory, and had caused a survey of it by Carter in 1890. Prima-facie it was in Chariton County, and therefore prima-facie it was granted to Chariton County. It was on that side of the river and under its control. In order to meet the situation Saline County must prove that the river, sixteen years before had shifted, and must show *how,* whether gradually or by an avulsion, the middle of the main channel, the statutory county line, had shifted. Three years later Chariton County made official survey of those accreted lands and assumed general jurisdiction over them. For thirty years Saline County "stood by" while Chariton County accomplished complete, continuous and notorious jurisdictional control, with all attendant burdens. Saline's action plainly said, as if in words: "It is too troublesome and expensive, crossing the treacherous river, to arrest criminals, serve process and collect taxes over there. The land is worth little. Let Chariton do it."

Chariton did it. Chariton County proceeded to sell the land and used the funds for school purposes, as the Act provides; built a school house, formed school districts, built bridges, laid out roads. Persons might commit any kind of crimes in that territory; Saline county felt no duty to suppress or punish them, but allowed Chariton to incur the burden of protecting the lives and the property of the people of that territory. Public records of Chariton County showed all those proceedings, conveyances of land, collection of taxes, establishment of schools, arrest of criminals, administering of estates and exercise over that territory of every function which a county can

exercise. Saline County was charged with notice. For more than thirty years it made no objection. *It makes none now.*

So, between the two counties, in the exercise of their governmental functions, under the authorities cited above, the Missouri River is the line which separates them. It is a matter of the exercise of governmental control and jurisdiction.

The element of deception and acting upon it by the party alleging estoppel, some times said to be essential in cases between individuals, is implied or non-essential in a contest between jurisdictions. This appears from the authorities quoted above (43 C. J. 138-139).

It follows that Saline County is estopped to say that the land in dispute is in Saline County. The plaintiff claiming by quit-claim deed from Saline County, has no greater right than his grantor. The Circuit Court of Saline County had no jurisdiction of the case.

III. Another feature of the problem comes in here:

Plaintiff sues for the Northwest Quarter of Section 19, Township 53, Range 19, and Southeast Quarter of Section 24, Township 53, Range 20, described as in Saline County. The deed by which he claims title describes the same land as parts of Sections 27 and 34, Township 53, Range 19, and he offers evidence to show they are the same, differently described by different surveys, as stated above. The deed, after the description of all the tracts conveyed, recites:

"As shown by survey made by A. F. Arrington, County Surveyor in and for Chariton County, in the month of November and December, 1898, and on file in the office of Recorder of Deeds in Chariton County, Missouri, containing in all 2491 acres."

The plaintiff then introduced the deposition of Samuel J. Carter, former surveyor of Chariton County, and in connection with it Exhibit C, a copy of his official survey made in 1890, based on Government field notes and showing the land described as in plaintiff's deed.

Then he introduced A. F. Arrington, former Surveyor of Chariton County, who identified the land described in the deed under which plaintiff claims, with the land in his petition. Arrington also said that the Carter survey, made in 1890, described the "land boundaries down there . . . practically the same as they were in 1898" when Arrington made his official survey. In connection with this testimony a plat, a copy of his official survey made in 1898, was introduced in evidence.

Section 12119, Revised Statutes 1919, which has been in force in the same form since the revision of 1889 and earlier, provides that no survey *except* that of the county surveyor shall be considered legal evidence in any court. Section 12721, Revised Statutes 1919, pro-

vides that certified copies of such survey may be introduced in evidence.

The copy of the Carter survey, made by him in 1890, was introduced by plaintiff, and certified by him as ''Surveyor of Chariton County.''

The plat of Arrington's survey was offered in evidence without objection. The plaintiff identified the land sued for in his deed by the official plat of Arrington, which was competent evidence because it was official. He identified it further by the official plat of Carter, which was evidence because it was official. He further identified it by the evidence of Arrington, who had nothing to go by except his official plat and that of Carter. None of these copies were objected to on account of any lack of certification.

Plaintiff cannot now be heard to say that those surveys were not official. They possess their validity and their competency as evidence only *because* they are official. He had no way to identify his land or to make out his case except by them. How then can he be heard to claim that Chariton County had no right to make those surveys? In other words, he is estopped to say that the land is not in Chariton County.

IV. The matter may be viewed from another standpoint. As stated above, plaintiff in making out his case showed that Chariton County was exercising exclusive jurisdiction over the territory in which this land lay, the bar lands. Exclusive, because the plaintiff also showed that Saline County was *not* attempting to exercise jurisdiction over it. The quit-claim deed under which he claims, recites:

''It is the purpose of the parties hereto to pass from Saline County to grantee herein, A. M. Randolph, all the right, title and interest *Saline County has or* claims to have in the lands formed by the abandonment by the Missouri River of its river bed and the islands and accretions thereto,'' etc.

The defendant later showed more completely in detail how Chariton County had exercised exclusive jurisdiction over this territory and how the *"Missouri River was always considered the boundary line between the counties"* on both sides of the river. Without that, the plaintiff could only make out his case by showing that Chariton County did exercise *de facto* governmental control over the land, and had done so from the time of the cut-off in 1879. It made an official survey in 1890, *before* the Act of 1895, and prima-facie, as stated above, the land was in Chariton County at the time of the passage of that act. That being the case, the plaintiff, in attempting to show the land was located in Saline County, was attacking collaterally the *de facto* governmental jurisdiction which he had already proved. This he could not do. [43 C. J. 137-139.]

Quotations from cases will illustrate the doctrine.

In State ex rel. Childs v. Crow Wing County Commissioners, 35 L. R. A. 745, the court said, after citing several cases:

"The theory of these cases seems to be that the mere *de facto* annexation of territory to a municipal corporation, or quasi-corporation, is always absolutely void as to everyone, and can always be attacked collaterally in any action or proceeding in which the question of the status of the territory may be material. We cannot subscribe to that doctrine. . . . But after such attempted annexation has been confirmed by user, taxes have been levied, expenses incurred, and other rights and liabilities have been created, we are clearly of the opinion that a *de facto* annexation may exist, which can only be questioned by the proper state authority in a direct proceeding for that purpose."

In Re Section 6, 68 N. W. 323, where the legality of the inclusion of territory in a county was under consideration, the court said:

"To permit private individuals to raise the question in collateral proceedings would manifestly result in serious consequences to public and private interests. It is settled, upon principle and authority, that where a municipal corporation is acting under color of law, and its corporate existence is not questioned by the State, it cannot collaterally be drawn into question by private parties."

This was solely on the question whether the county had a right to exercise jurisdiction, as it did, over certain land which was claimed to be outside its territory.

In State v. Rich, 20 Mo. 393, the legality of the organization of Stone County was challenged. It was claimed that the act of the General Assemmbly was contrary to the Constitution because it reduced Taney County, from which it was detached, below the constitutional ratio of representation. The court held that the validity of that act could not be inquired into in the collateral proceeding.

In the State Bank of Pender v. Frey, 91 N. W. 239, the Supreme Court of Nebraska had under consideration the act of registering and attaching territory to a county, and held that it was the act of a *de facto* officer and could not be inquired into collaterally, where it was accepted and acquiesced in.

In Harris v. City of Port Arthur, 267 S. W. 349, the Court of Civil Appeals of Texas considered the annexation of territory to a municipality. The court said (l. c. 351):

"On these facts appellant, as a private citizen of Port Arthur, could not attack the validity of the attempted annexation in this collateral proceeding, but this could be done only in a direct proceeding 'brought for that purpose in the name of the State.' "

State ex rel. v. School District of Lathrop, 314 Mo. 315, was a *quo warranto* proceeding whereby a taxpayer owning real estate challenged the authority of the school district of Lathrop to exercise

jurisdiction over the relator's land lying in two school districts which had been annexed to the School District of Lathrop by a void proceeding. The evidence showed that after the attempted annexation there was no school in those districts. The children there attended school in the district of Lathrop. The land in that annexed territory was taxed to support schools in the School District of Lathrop. The relator had brought a previous suit in the circuit court to enjoin the collection of taxes for certain purposes, alleging that he was *in* the School District of Lathrop, which suit had been decided against him. The people living in the annexed territory and annexed district had voted for directors in the School District of Lathrop. This court held that the acquiescence in the *status quo* by the relator was such laches as to prevent his recovery, citing the Westport case, the Mansfield case, and others, supra.

In State ex rel. Consolidated School District v. Jones, County Clerk, 320 Mo. 353, 8 S. W. (2d) 66, this court held that the validity of the proceedings by which territory was taken into a school district could not be attacked collaterally.

In nearly all the cases quoted above there had been some attempted annexation or disconnection of territory, by a void statute or illegal proceeding. The *de facto* jurisdiction could not be called in question by showing a misunderstanding of the law. In this case the river changed its course. An old statute made the middle of the main channel the county line, but the court held that the common law rule prevailed, that a sudden avulsion did not change the boundary line. That was in doubt until decided. When the citizens of Saline County and Chariton County treated the new river channel as the county line it was merely a misunderstanding of the law, not different in any way from the misunderstandings of the law in the cases where a void statute or invalid action causes a change of jurisdiction.

It follows from these authorities that the plaintiff cannot attack collaterally the jurisdiction of Chariton County over this land. Therefore the Circuit Court of Saline County had no jurisdiction of the case. It might be claimed in this connection that the plaintiff is equally estopped to assert that Saline County ever had title to the land or to deny that the title was in Chariton County, which exercised such control over it, took possession, surveyed it, sold it; but that is not necessary to a determination of this case. The Circuit Court of Saline County could not pass upon that question for want of jurisdiction of the case.

The judgment is reversed. All concur, except *Frank, J.*, not sitting.